658 F.2d 720
 1981-2 Trade Cases 64,322
 Ronald T. DREISBACH, individually and dba Dreisbach
Enterprises, Inc., et al., Plaintiffs-Appellants,
v.
John MURPHY, et al., Defendants-Appellees.
 Nos. 79-4775, 80-4009.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 13, 1981.
Decided Oct. 8, 1981.
 
 Chris G. Gasparich, Crosby, Heafey, Roach & May, Oakland, Cal., for plaintiffs-appellants.
 Richard A. Ardoin, Bronson, Bronson, & McKinnon, Nathan Lane, III, Graham & James, R. Frederic Fisher, Llick, McHose & Charles, James D. Boughey, Dorr, Cooper & Hays, San Francisco, Cal., for defendants-appellees.
 On Appeal from the United States District Court Northern District of California.
 Before MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals, MERRILL and FARRIS, Circuit Judges.
 MARKEY, Chief Judge.
 
 
 1
 Appellants (collectively, Dreisbach) appeal from an order of the District Court for the Northern District of California granting summary judgment and dismissing an antitrust action against Farrell Lines, Inc., Columbus Line, Inc., and Pacific Australia Direct Line, Inc. (collectively, Carriers), and from an order granting summary judgment and dismissing the action against Weighmaster Murphy, Inc., Murphy Transportation Company, Inc., John Murphy, and Charles Murphy (collectively, Murphy). We affirm.
 
 Background
 
 2
 Carriers transport frozen meat in large containers from Australia and New Zealand to Pacific Coast ports in the United States. Carrier-owned containers have been likened to "detachable stowage compartments of the ship" wherein cargo is stowed "utilizing stevedoring practices and materials analogous to those employed in traditional on board stowage." Matsushita Electric Corp. v. S. S. Aegis Spirit, 414 F.Supp. 894, 907 (W.D.Wash.1976).
 
 
 3
 Federal law requires inspection of imported meat, necessitating the unloading or "devanning" of the containers, each holding up to 18 tons. Before 1972, containers were devanned at the pier. That was costly and unsatisfactory. Cartons of meat were removed and laid out, waiting arrival of a federal meat inspector and adding to pierside congestion. The inspector would randomly select cartons, take them to an inspection facility, inspect the meat and return, sometimes the following day. Only then could meat be taken from the pier. Meanwhile it sat, thawing and sometimes spoiling, in the unrefrigerated terminal.
 
 
 4
 In 1972, Murphy opened a devanning facility three miles from the piers used by Carriers in Los Angeles. For a fee ("devanning allowance"), Murphy picks up containers at the piers, takes them to his refrigerated facility, "unstuffs" them, prepares the cartons for inspection, and promptly returns the empty containers to the pier.
 
 
 5
 Because ocean carriers have the devanning responsibility, each contracts with an agent in each port to devan its containers and pays a devanning allowance. Importers have the inspection responsibility and pay for the inspection. Importers have the right to designate the site for inspection. Though economics dictate a combined inspection and devanning facility, sufficient importer support may influence carriers to select a devanning/inspection facility preferred by the importers.
 
 
 6
 Since 1972, Carriers and importers have used only Murphy's devanning/inspection facility in Los Angeles. In August, 1976, Dreisbach decided to open a competing facility, proposing to charge Carriers the same devanning allowance charged by Murphy. Dreisbach's facility would be 18 miles from the piers.
 
 
 7
 According to Dreisbach's complaint: (1) officials of two Carriers assured Mr. Dreisbach in September, 1976, that they would use his services; (2) relying on those assurances, he expended large sums of money in leasing and outfitting a facility; (3) the two Carriers reneged; and (4) all three Carriers conspired to "boycott" Dreisbach's services.
 
 
 8
 On April 21, 1978, Dreisbach sued Carriers and Murphy. The amended complaint of December 13, 1978, contained allegations under sections 1 and 2 of the Sherman Act (Counts 1-3), section 5 of the Federal Trade Commission Act (Count 4), California antitrust and unfair competition statutes (Counts 5 and 6), and California contract law (Counts 7-9). Dreisbach sought only money damages for past and completed unlawful conduct. After substantial discovery, Carriers and Murphy moved for summary judgment seriatim. At a hearing on the motion, Dreisbach abandoned all but an assertion that Carriers' agreement to use only Murphy's devanning services adversely affected his opportunities to engage in inspection and transportation of the meat delivered by Carriers. The district court granted the motions.
 
 
 9
 Though the court's order of October 22, 1979, granting Carriers' motion, does not state reasons, the transcript makes clear the court's view that the alleged conspiracy, if established by competent evidence,[1] would be within the antitrust exemption conferred by Federal Maritime Commission (FMC) approval of certain Conference Agreements, Agreements 10012 and 10252, under section 15 of the Shipping Act, 46 U.S.C. § 814 (1976).[2]
 
 
 10
 Based on the initial order, Murphy moved for summary judgment. On December 17, 1979, the court granted that motion, stating in relevant part:
 
 
 11
 The Court finds that the immunity which covers the alleged agreement between defendants Farrell Lines, Inc., Columbus Lines, Inc., and Pacific Australia Direct, Inc. under the Shipping Act of 1916 also extends to defendants John Murphy, Charles Murphy, Weighmasters Murphy, Inc., and Murphy Transportation Co., Inc. in order to protect and further the legislative purpose of such Act.
 
 Approved FMC Agreements
 
 12
 The Carriers are parties to two Conference Agreements filed under section 15 of the Shipping Act and approved by the FMC. Agreement 10012, approved in March, 1973, governs "the transportation of freight from ports in Australia, and inland points via such ports, to ports on the Pacific Coast of the United States, and inland points via such ports." It provides in pertinent part:
 
 
 13
 1. Consultation and Agreement; Notification, Independent Action. The parties may confer with each other and discuss together, from time to time, at the request of any party, any subject of common interest in the trade, including rates, charges, classifications, practices, brokerage, equalization, absorption, transshipment, and overland and/or other inland movements, and tariff matters relating and/or pertaining to any of the said subjects, and rules and regulations to govern the parties' conduct in connection therewith. Subject to the limitations contained in the second paragraph of this Article 1, the parties may agree upon any such subject and/or matter, to be observed by each of them respectively, in the trade.... (Emphasis added)
 
 
 14
 Agreement 10252, approved in December, 1976, governs the trade from New Zealand (One Carrier does not participate in the New Zealand trade and is not a party to that Agreement). Article 1 of Agreement 10252 is substantially identical with Article 1 of Agreement 10012.
 
 The Issues
 
 15
 (1) Whether the case should be referred to the FMC under the doctrine of primary jurisdiction.
 
 
 16
 (2) Whether the district court correctly held that FMC approval of Agreements 10012 and 10252 exempted the Carriers from liability in damages under the federal antitrust laws for activities alleged by Dreisbach.
 
 
 17
 (3) Whether the district court correctly held that FMC approval of Agreements 10012 and 10252 exempted Murphy from liability under the federal antitrust laws for activities alleged by Dreisbach.
 
 
 18
 (4) Whether the district court correctly held that it lacked jurisdiction to entertain Dreisbach's complaint under § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (1976).
 
 OPINION
 
 19
 (1) Referral to FMC
 
 
 20
 At the request of this court, the parties separately briefed the question of whether this case should be referred to the FMC, under the doctrine of primary jurisdiction. Each party strenuously and vigorously argues against referral. Each, however, in an exercise of caution, says referral should be ordered if the court would otherwise, on this record, decide for the other party.
 
 
 21
 Dreisbach says referral is improper because he seeks only money damages for past conduct and an award would thus not interfere with any future action of the FMC, citing Litton Systems, Inc. v. Southwestern Bell Tel. Co., 539 F.2d 418, 423 (5th Cir. 1976), and Allied Air Freight, Inc. v. Pan American World Airways, Inc., 393 F.2d 441, 447-49 (2d Cir. 1968), cert. denied, 393 U.S. 846, 89 S.Ct. 131, 21 L.Ed.2d 117 (1968), and because "the FMC cannot immunize conduct whose sole aim is to destroy competition in markets unaffected by its regulatory control". Carriers say referral is not required because their conduct clearly is authorized as a matter of law.[3]
 
 
 22
 There is no fixed formula for applying the doctrine of primary jurisdiction. United States v. Western Pacific Railroad, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956). Reference to an administrative agency may be appropriate if an issue before the court "involves technical questions of fact uniquely within the expertise and experience of an agency," or if reference would facilitate uniformity of regulation, Nader v. Allegheny Airlines, 426 U.S. 290, 304, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976), or if the agency's determination would materially aid the court's resolution of an issue, Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 302, 93 S.Ct. 573, 580, 34 L.Ed.2d 525 (1973). There are here no questions of fact, technical or otherwise. There is no indication that uniformity of regulation, or any future FMC action, is in any manner implicated.
 
 
 23
 Though reference to FMC would escape the need to decide the issue, even that aid would be but temporary if the loser before the FMC should elect to appeal its decision to the court. Reference to FMC would thus not truly aid our resolution of the controversy presented, wherein the questions before us are solely questions of law raised on an appeal from the grant of a motion for summary judgment. Resolution requires the construction of the plain language and legal effect of agreements, a function within the expertise of courts.
 
 
 24
 In Cargill, Inc. v. Federal Maritime Commission, 530 F.2d 1062 (D.C.Cir.), cert. denied, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976), Pacific Westbound Conference v. Federal Maritime Commission, 440 F.2d 1303 (5th Cir.), cert. denied, 404 U.S. 881, 92 S.Ct. 202, 30 L.Ed.2d 162 (1971), and Port of New York Authority v. Federal Maritime Commission, 429 F.2d 663 (5th Cir. 1970), cert. denied, 401 U.S. 909, 91 S.Ct. 867, 27 L.Ed.2d 806 (1971), the courts considered FMC orders. In Cargill, and Port of New York, the courts affirmed an FMC holding that the assailed conduct fell within the scope of a § 15 Agreement. In Pacific Westbound, the court sustained an FMC holding that certain conduct was not within such scope, but went on to reverse a contrary FMC holding respecting other conduct in light of the court's construction of the "plain language" of the agreement. These cases establish that the touchstone lies in the scope of the § 15 Agreements under consideration, that courts will themselves decide the breadth of that scope and whether specific conduct comes within it, and that carriers need not seek approval of conduct falling within that scope, the court stating, for example, in Port of New York, "the overland/OCP rates in question and the practices involving the absorption of terminal charges were routine matters under the conference agreements, theretofore approved, and thus not required to be filed for § 15 approval." 429 F.2d at 667.[4]
 
 
 25
 If, as appears below, the plain language of the § 15 Agreements on the present record encompasses Carriers' agreement to use Murphy as their one devanner in Los Angeles, and that agreement is not directly contested by appellant Dreisbach, it would make no sense to refer the matter to the FMC. Whether FMC, on a different and more complete factual record, might reach a different conclusion is irrelevant here, where the parties seek a decision of this court as to whether summary judgment was properly granted on the record as presented.
 
 
 26
 In the present case, the district court necessarily proceeded on the premise that "when words of a written instrument are used in their ordinary meaning, their construction presents a question solely of law". Great Northern Railing Co. v. Merchants Elevator Co., 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922). In so doing, it was in good company. See World Airways, Inc. v. Northeast Airlines, Inc., 349 F.2d 1007, 1011 (1st Cir. 1965), cert. denied, 382 U.S. 984, 86 S.Ct. 561, 15 L.Ed.2d 473 (1966); United States v. Open Bulk Carriers, Ltd., 465 F.Supp. 159, 165 (S.D.Ga.1979); In re Ocean Shipping Antitrust Litigation, 500 F.Supp. 1235, 1242, 1243 (S.D.N.Y.1980). To the extent necessary, we proceed here on that same premise.
 
 
 27
 When FMC approved Agreement No. 10012, the carriers had been exclusively employing Murphy's devanning service for some time. When FMC approved Agreement No. 10252, they had been exclusively employing Murphy's devanning services for four years. As discussed below, we construe the scope of the approved § 15 Agreements as encompassing the Carriers' arrangement with Murphy. That arrangement is therefore authorized by those Agreements and is clearly lawful. It is not merely "arguably lawful", as was the conduct in Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 222-24, 86 S.Ct. 781, 787, 15 L.Ed.2d 709 (1966) (appropriate disposition of an antitrust suit alleging conduct "arguably lawful under the Shipping Act" is a stay, pending final FMC action, not dismissal of the action).
 
 
 28
 Neither the basic purpose of the doctrine of primary jurisdiction nor any other useful purpose, would be served by forcing the reluctant parties here to undergo the additional years of litigation (e. g., five years in Carnation, supra) that would result from a reference to the FMC for a determination of whether it considers as falling within the scope of the § 15 Agreements a practice in operation at the time it approved both Agreements, particularly when that practice falls, as we shall see, and as Dreisbach does not in fact contest, directly within the plain language of the Agreements.
 
 
 29
 Neither party alleges any ambiguity in the applicable language of the Agreements, and we find none. The very purpose of authorizing language in § 15 Agreements is to permit carriers to agree upon routine operational practices that fall within their scope, without a constant returning to FMC for approval of each such individual agreement. If that were not so, there would be no reason for such authorizing language. Carriers could not, of course, agree on subjects beyond those authorized. It would defeat the purpose of the authorizing language, however, if carriers were required to return to FMC for approval every time they agreed on a routine operating practice falling within that language, such as joint and exclusive use of a routine service rendered by a port, a pier, a warehouse, a ship repair facility, a refueler, or a devanner.[5] It would equally defeat the purpose of the authorizing language if one merely offering to sell a routine service could thereby force carriers, under threat of a suit for damages, to seek FMC approval of their decision not to purchase from him.
 
 
 30
 Either the language of the approved § 15 Agreements authorizes Carriers to agree to use one devanner or it does not. Considering the purely legal nature (Agreement interpretation) of the controlling question before us, and the need for judicial economy at this late stage in the litigation, we decline to refer the case to the FMC and proceed to its resolution.(2) Carrier Liability
 
 
 31
 Dreisbach's position in this litigation has been chameleonic.[6] Initially, in proceedings before the district court, he argued that the FMC-approved Agreements cover only ratemaking and, accordingly, an arrangement by Carriers to use one devanning agent falls outside the scope of those Agreements. However, when the court noted that those Agreements cover much more than ratemaking, Dreisbach retreated. He said:
 
 
 32
 If all we were complaining about was the fact that my client can't get devanning service or can't be permitted to provide devanning services because of this agreement, we wouldn't be here. As I've taken at some length to point out to the court and which has not been disputed or denied in any way by these three shipping Carriers, the agreement to designate Murphy as the off-dock devanning agent results as a matter of fact in designating him as the exclusive monopoly to do inspection services. (Emphasis added.)
 
 
 33
 ....
 
 
 34
 By virtue of their agreement to designate Murphy as the only one who can unstuff the containers, they have conferred upon Murphy a monopoly in the inspection business.
 
 
 35
 ....
 
 
 36
 That's the vice, of course, in the agreement, that it (inspection) is a natural consequence (of devanning).
 
 
 37
 Thus Dreisbach not only does not deny but positively states that the § 15 Agreements cover routine practices such as devanning, and that Carriers, pursuant to those Agreements, were authorized to select Murphy as sole devanning agent. Dreisbach's complaint is that the Carriers' designation of Murphy as exclusive devanning agent adversely affected Dreisbach's operation of an inspection business, a business he says is not "within the purview of the FMC".
 
 
 38
 According to Dreisbach, "the shipping companies, as a matter of fact, don't have the right under any law to dictate to importers or to people who would compete in the inspection business as to who's going to be doing the inspection business. That's what our lawsuit is all about." (Emphasis added.) Dreisbach's difficulty is that Carriers did nothing with respect to inspection. All they did was refuse his devanning service, and he does not challenge their authority to do precisely that.
 
 
 39
 Later, before the district court, Dreisbach said:
 
 
 40
 Judge, there's nothing in that Agreement (FMC-approved § 15 Agreements) they presented to you that says they can't engage in activities which would confer upon another person the monopoly to do devanning. There's nothing in it that says they can confer ... upon somebody else monopoly in inspection or in transportation.
 
 
 41
 Before us, Dreisbach reverts to a narrow interpretation of the FMC-approved § 15 Agreements, again characterizing them as limited to "ratemaking" and relying heavily on this language in the FMC order approving Agreement No. 10012:
 
 
 42
 The purpose of the agreement is for the named carriers to establish and quote freight rates and related tariff matters to apply from ports in Australia, and inland points via such ports, to ports on the Pacific Coast of the United States, and inland points via such ports.
 
 
 43
 He then argues that the agreement to continue using Murphy's devanning services exclusively extends beyond "simple conference ratemaking". In doing so, and in disregard of what he told the district court, he includes devanning, along with inspection and transportation, as "non-maritime activities" described by him as outside FMC's jurisdiction.
 
 
 44
 Dreisbach's brief, in discussing a meeting with Carriers' representative, describes his awareness of the Carriers' freedom to agree respecting devanning:
 
 
 45
 Wedekind did add, however, that it had also been discussed that if one of the three lines provided Dreisbach with the devanning allowance, then all the others would have to do the same (a fact well known to Dreisbach based on his experience in northern California).
 
 
 46
 Dreisbach's status on appeal is that of one seeking damages for Carriers' refusing to change an established practice he admitted below they were authorized to follow. As above mentioned, Carriers had been using Murphy's devanning service exclusively for over four years, under their authority to agree among themselves, when Dreisbach appeared on the scene, urging Carriers to use his service. At another point in his brief, Dreisbach does say he never suggested "that his services should be used to the exclusion of Murphys (sic) in Los Angeles", but only sought to "compete on an even keel with the Murphys". That statement, insofar as it relates to devanning, is directly contrary to Dreisbach's statement below that he "wouldn't be here" if his only complaint was lack of permission to "provide devanning services". Thus Dreisbach agrees that Carriers are free to agree on the practice of engaging a devanner, but argues that they must pay him damages for doing so when the result limits his inspection activities. Dreisbach is in effect saying that he, and presumably all other suppliers of services, are entitled to demand of carriers, "Pay me anti-trust damages for not facilitating my entry into a business affected by your conduct authorized under your approved § 15 Agreements". If carriers were held responsible for damages to all those affected by activities legally conducted under FMC-approved Agreements, the intent and purpose of § 15 of the Shipping Act would be stultified.
 
 
 47
 Absent § 15 of the Shipping Act, an agreement to use one supplier might well, without more, run afoul of our antitrust laws. Whether agreement to use one devanner is business-justified, or a "good idea", or even fair, are questions not before us. Nor, in view of Dreisbach's arguments, is the question directly presented here of whether Carriers are authorized by their approved § 15 Agreements to agree to use one devanning service in Los Angeles and are thus automatically authorized to agree to decline Dreisbach's offer of devanning services. We nonetheless treat the question of authorization in view of its presence as the foundation of the district court's decision.
 
 
 48
 In neither the district court nor in this court does Dreisbach confront the plain language of Article 1 in each FMC-approved Agreement:
 
 
 49
 The parties may confer with each other and discuss together ... any subject of common interest in the trade, including rates ... practices ... and overland and/or other inland movements ... and rules and regulations to govern the parties' conduct in connection therewith.... the parties may agree upon any such subject ... to be observed by each of them respectively, in the trade.
 
 
 50
 As Dreisbach recognized before the district court, the § 15 Agreements are thus not limited to ratemaking, but encompass a range of "practices". The ordinary meaning of "practice" is a "repeated or customary action". Webster's New Collegiate Dictionary, 902 (1974). As above noted, the practice of using an exclusive devanning agent in Los Angeles was established and had been customary for over four years when the Agreements were approved and when Dreisbach came along. That practice falls squarely within the terms of the Agreements and the specific authorization therein for Carriers to discuss and "agree" upon "practices" and "overland and/or other inland movements". It also falls within the description of the Agreements as governing "transportation of freight ... to ports on the Pacific Coast ... and inland points via such ports". That the FMC order approving Agreement No. 10012 acknowledges a ratemaking purpose does not alter the plain language of Article 1 of the Agreements.
 
 
 51
 Consistent with his assertion below that the inspection business is "what our lawsuit is all about", Dreisbach nowhere argues that devanning is not a routine "practice" envisaged in the approved § 15 Agreements, or that Carriers' agreement to use Murphy as exclusive devanning agent was not an agreement on a subject ("overland and/or other inland movements") upon which Carriers were authorized to agree. On the contrary, Dreisbach below and before us disregards the specific authorizing language of the Agreements, resting content with an assertion that certain "non-maritime activities" affected thereby are functions outside FMC's jurisdiction.
 
 
 52
 We cannot agree with Dreisbach's characterization of Carriers' challenged conduct as involving "non-maritime" activity. The agreement among the Carriers for Murphy alone to devan concerns a function that Carriers themselves performed before 1972 and one for which they remain responsible. Until the frozen packages are "unstuffed" at Murphy's facility, they are in the current of maritime commerce. Contrary to his concession below (that denial of his proffered devanning services was not complained of) Dreisbach lumps "devanning" with "inspection and transportation" under his "non-maritime" label. That joinder of functions is improper, the notion that unloading of containers is a non-maritime function, over which the FMC lacks regulatory responsibility, being without merit. That inspection may be inextricably tied economically to devanning cannot in itself be held to negate the FMC approval of Agreements No. 10012 and 10252 and the antitrust exemption accorded to maritime practices of Carriers operating under those Agreements. Nothing of record indicates that transportation is involved in any agreement among the Carriers.[7]
 
 
 53
 That the joint refusal to grant his request to add his devanning services adversely affects Dreisbach's ability to compete in providing inspection and transportation services may be true. It cannot be controlling. That there may be an adverse effect upon a potential supplier's business plans, resulting from Carriers having done what they are authorized in a § 15 Agreement to do, does not alone give rise to an action for damages. Indeed, if Dreisbach were entitled to an award of damages for what he recognized below as the "natural consequence" of authorized Carrier conduct, that would defeat the Congressional purpose in enacting § 15 of the Shipping Act. A holding that carriers must pay damages to all parties adversely affected by the natural consequences of conduct authorized under FMCapproved § 15 Agreements would legitimize a collateral attack on the statute itself and would diminish, if not destroy, the ability of carriers to enjoy the antitrust immunity envisaged in the Act.
 
 
 54
 Though Dreisbach would have us read the present § 15 Agreements narrowly, we are guided toward a broader view of "a statute that uses expansive language." Volkswagenwerk v. FMC, 390 U.S. 261, 273, 88 S.Ct. 929, 936, 19 L.Ed.2d 1090 (1968). As stated in Volkswagenwerk, 390 U.S. at 276, 88 S.Ct. at 937, "(n)othing in the legislative history suggests that Congress, in enacting § 15 of the Act, meant to do less than ... subject to the scrutiny of a specialized government agency the myriad of restrictive agreements in the maritime industry" (footnote omitted). The § 15 Agreements here were subjected to that scrutiny and were approved. The conduct here challenged, use of one devanner, and the consequent rejection of Dreisbach's offer, involved a routine matter falling within the scope and authorization of those approved Agreements.[8]
 
 
 55
 Those authorized by approved § 15 Agreements to agree are not responsible in damages for agreeing. Agreements No. 10012 and 10252 are each the specific type of agreement among carriers contemplated by § 15, which exempts actions implementing an approved Agreement from the federal antitrust laws. Because Carriers in this case were operating within the scope of their approved Agreements in agreeing to use one devanner, they are exempt from the particular antitrust attack mounted here for damages by Dreisbach, and the district court's grant of summary judgment to Carriers must be affirmed.
 
 
 56
 (3) Murphy's liability
 
 
 57
 In the case at bar, Carriers' conduct under Agreements No. 10012 and 10252 being exempt from the federal antitrust laws, Murphy's conduct as exclusive devanning agent is necessarily exempt. Manifestly, Carriers could not carry out their agreement on devanning if, by so doing, they would subject their selected devanner to a charge of antitrust violation. There is no evidence anywhere in the record that Murphy was a party to any agreement with Carriers, or that Murphy made any concession or otherwise acted to retain his position as sole supplier of devanning services. There is no evidence that Murphy even knew of Carriers' conversation with Dreisbach.[9]
 
 
 58
 Every agreement of carriers to use one supplier of a service can be said to confer monopoly status and antitrust immunity on that supplier, at least insofar as rendering the service to those carriers is concerned.[10] To say that that result requires return to FMC, or that it compels an award of damages to other suppliers, is but to say that the § 15 Agreement under which carriers are operating did not authorize them to agree to use one supplier. As above set forth, we hold the language of the § 15 Agreements in this case of sufficient breadth to authorize Carriers to agree to use one devanner. In so agreeing, Carriers were enjoying their own immunity under § 15 of the Shipping Act.
 
 
 59
 Murphy being essential to implementation of an authorized agreement among Carriers, we agree with the district court that, like Carriers, Murphy is exempt from antitrust attack "in order to protect and further the legislative purpose of (the Shipping) Act".[11]
 
 
 60
 (4) Federal Trade Commission Act
 
 
 61
 In Count 4 of his complaint, Dreisbach asserted, as a separate basis for recovery, that Carriers and Murphy violated § 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (1976): "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful".
 
 
 62
 This circuit has held that private litigants may not invoke the jurisdiction of the federal district courts by alleging that defendants engaged in business practices proscribed by § 5(a)(1). The Act rests initial remedial power solely in the Federal Trade Commission. Carlson v. Coca-Cola Co., 483 F.2d 279 (9th Cir. 1973). Accordingly, Count 4 was properly dismissed by the district court.
 
 Conclusion
 
 63
 Assuming that the evidence would establish a violation of the antitrust laws, in the Carriers' agreement to use Murphy's devanning services exclusively (and assuming that the necessary result may be described as a "boycott" of Dreisbach's devanning services), we hold that agreement to be within the scope of approved § 15 Agreements 10012 and 10252, and that FMC approval of those Agreements therefore exempted Carriers and Murphy from liability for damages sought by Dreisbach for the effects of Carriers' action under those Agreements. We hold also that the district court lacked jurisdiction to entertain Dreisbach's complaint under § 5 of the Federal Trade Commission Act.[12]
 
 
 64
 AFFIRMED.
 
 MERRILL, Circuit Judge, dissenting:
 
 65
 I dissent and would remand to the district court to have it decide whether the alleged agreement not to deal with Dreisbach actually did exist. Appellants alleged such an agreement and the issue thus was presented whether the carriers' refusal to deal was in each case an independent business judgment or was a concert of action pursuant to an agreement between them to deal only with Murphy. The district court never reached that question, ruling that any such agreement would be rendered immune from the antitrust laws by reason of the FMC approval of the section 15 agreements 10012 and 10252. It is the validity of that holding that is the question presented on this appeal.[1]
 
 
 66
 While the § 15 agreements do purport to authorize the parties to agree upon any subject of common interest in the trade, in my opinion Commission authorization and approval must be held to be limited to routine implementation of the agreements and to conduct that they apparently contemplated.
 
 
 67
 Section 15 of the Shipping Act, 46 U.S.C. § 814, requires that carriers shall file with the Commission "every agreement * * * giving or receiving * * * special privileges or advantages; controlling, regulating, preventing or destroying competition; * * * or in any manner providing for an exclusive, preferential, or co-operative working arrangement * * *." "The Commission shall * * * disapprove * * * any agreement * * * that it finds to be unjustly discriminatory or unfair * * * or to be contrary to the public interest * * *." (Emphasis supplied.)
 
 
 68
 The requirement of Commission approval is understandable, since it was contemplated by Congress that conference agreements would have anticompetitive aspects. Accordingly, the public interest in free competition must be balanced against the need of the carriers, in the public interest, to avoid the consequences of open competition. The alleged agreement not to deal with Dreisbach is an anticompetitive arrangement that has never had such Commission consideration and approval.
 
 
 69
 While it is true that the carriers were dealing with Murphy at the time their agreements received Commission approval, that arrangement did not then amount to a refusal to deal with anybody else. Dreisbach was not then on the scene. The agreement now under scrutiny is the alleged agreement not to deal with Dreisbach. It goes far beyond a routine agreement between carriers not to compete with each other in certain respects. The carriers are doing more than enjoying their own immunity from antitrust violation. Their alleged agreement confers monopoly status and antitrust immunity upon Murphy one not otherwise immune, not party to the approved agreements, and not subject to Commission regulation. I would hold that such an agreement requires independent Commission approval.
 
 
 70
 Accordingly, I would remand to the district court for determination of the question whether the alleged agreement not to deal with Dreisbach in fact did exist. Should it be found to exist, I would hold that it must be held invalid in absence of Commission approval.
 
 
 
 *
 The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 For purposes of this appeal, we assume, without deciding, that: (1) there was an agreement among Carriers to use Murphy's devanning services exclusively (thus necessarily "boycotting" Dreisbach and all other devanners); and (2) that agreement would be a violation of the antitrust laws if not covered by the approved § 15 Conference Agreements. The dissent would remand for a factual finding on whether Carriers agreed to decline Dreisbach's devanning services. That would defeat the value inherent in the summary judgment procedure invoked here, where, for purposes of their motion, Carriers conceded that they agreed not to employ Dreisbach's devanning services, thus presenting the purely legal question of whether that conduct was encompassed by the language of their approved § 15 Agreements. A remand would also appear fruitless in light of Dreisbach's concession, discussed in the text, that his complaint had nothing to do with Carriers' refusal to employ his devanning services
 
 
 [2]
 Section 15 provides in pertinent part:
 Every common carrier by water ... shall file immediately with the Commission a true copy ... of every agreement ... fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement...
 The Commission shall by order, after notice and hearing, disapprove ... any agreement ... that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors, or to operate to the detriment of the commerce of the United States, or to be contrary to the public interest, or to be in violation of this chapter, and shall approve all other agreements ...
 Every agreement, modification, or cancellation lawful under this section ... shall be excepted from the provisions of (the Sherman Antitrust Act) ...
 
 
 [3]
 In proceedings before the district court, the court repeatedly invited Dreisbach to take his case to the FMC, and Dreisbach repeatedly declined
 
 
 [4]
 In Greater Baton Rouge Port Commission v. United States, 287 F.2d 86 (5th Cir. 1961), cert. denied, 368 U.S. 985, 82 S.Ct. 600, 7 L.Ed.2d 523 (1962), Cargill, Inc., a large grainhandling company, had the exclusive right to operate a public grain elevator in the Greater Baton Rouge port area by virtue of an agreement with the Baton Rouge Port Commission. After Cargill amended the agreement, in an attempt to control all stevedoring business at the elevator, Cargill and the Port Commission filed both original and amendment with the Federal Maritime Board (predecessor of the FMC) for § 15 approval. The Board approved the original agreement, but disapproved the amendment. In contrast to the instant case, there was no issue presented on whether a particular practice of ocean carriers fell within the scope of the agreement-authorizing language in an original, approved § 15 Agreement
 
 
 [5]
 The record is silent on whether FMC was specifically aware of the use of one devanner in Los Angeles when it approved the § 15 Agreements, and on whether that use was reported under 46 C.F.R. 537.1-537.4
 
 
 [6]
 In addition to abandonment of numerous allegations in the complaint, Dreisbach employs on appeal the tyranny of a word in characterizing Carriers' conduct as a "boycott". Nowhere are we favored by any distinction between Carriers' agreement to use only Murphy's devanning service and an agreement not to use Dreisbach's devanning service. Nor are we told why the latter is not concomitant with the former. Nor are we told why, if Carriers' original agreement to use only one devanner was authorized, their re-affirmation of that agreement when Dreisbach approached was not equally authorized
 
 
 [7]
 Dreisbach merely implies that the Carriers' agreement results in exclusive trucking possibilities, by pointing to trucking advantages accruing to devanners. Treating as one the "devanning, inspection, and transportation markets", Dreisbach asserts that if he had a devanning contract Penguin Trucking Company, Inc. (owned by Dreisbach) could transport the meat after inspection to a point of sale. However, nothing in Carriers' use of Murphy for devanning, on this record, precludes Penguin or anyone else from competing for the business of transporting the meat after inspection
 Similarly, Dreisbach is here insisting that Carriers pay damages for not insuring him an opportunity to render a service to others (the importers). Because importers designate the cite for inspection, and the record is devoid of contrary evidence, devanning sites may well be dictated by inspection locations, and not the other way round. Though it is apparently agreed that inspection and devanning are economically tied, the record makes clear that inspection is in control of importers who must pay for it, and that Dreisbach listed only one importer as saying it would employ him for inspection. The record also reflects some responsiveness of carriers to desires of importers concerning inspection, giving rise to an implication that more than one devanner would be employed when the demands of importers concerning inspection so require. We do not, however, reach our determination here on the basis of such considerations.
 Moreover, if there be effects not evidenced in the record here but appearing to warrant investigation, FMC is authorized to investigate sua sponte. 46 U.S.C. § 821 (1976). We hold only that Carriers are not responsible in damages to Dreisbach for having agreed, under the approved § 15 Agreements, to continue using their one devanner in Los Angeles.
 
 
 [8]
 Dreisbach cites Federal Maritime Commission v. Seatrain Lines, 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620 (1973), in which the Court held that FMC's jurisdiction did not encompass the approval of an agreement for one carrier to acquire all the assets of another and which creates no ongoing obligations. Though the Court there declined to read the expanse of § 15 broadly enough to cover that type of agreement, its holding does not affect the interpretation of the entirely different conference agreement involved in this case
 
 
 [9]
 Though it is unnecessary to determine whether there was a conspiracy in this case, we note in passing that Dreisbach's amended complaint contains the blanket allegation: "Plaintiffs are informed and believe that each of the Defendants combined, conspired and agreed with each of the other Defendants to monopolize ...", and an allegation that Murphy induced Carriers to decline Dreisbach's devanning services. Those allegations are not, however, supported by evidence. On the contrary, Dreisbach's affidavit is conspicuously silent concerning Murphy's involvement in any conspiracy or inducement of Carriers, even though Dreisbach had ample opportunity to develop his case through extensive discovery. It is well settled that the sufficiency of the allegations in a complaint do not determine motions for summary judgment. Smith v. Mack Trucks, Inc., 505 F.2d 1248, 1249 (9th Cir. 1974); William J. Kelly Co. v. Reconstruction Finance Corp., 172 F.2d 865, 866 (1st Cir. 1949); Lindsey v. Leavy, 149 F.2d 899, 902 (9th Cir. 1945)
 
 
 [10]
 There is no evidence, and no allegation, that the Carriers here are the only carriers requiring a devanning service in Los Angeles, or that Dreisbach was impeded in any manner from seeking to render devanning services in Los Angeles to other carriers
 
 
 [11]
 Because we agree with the district court that the challenged Carrier conduct is antitrust-immune, it is unnecessary to reach the assertion by one Carrier that evidence of its involvement in any conspiracy was inadequate. According to Pacific Australian Direct Line, Inc. (PAD), that evidence consists of: (1) inadmissible hearsay, i. e., an assertion that employees of the two other Carriers told Dreisbach about an agreement on devanning; and (2) parallel conduct, i. e., no Carrier used Dreisbach's services. PAD contended that Dreisbach, absent direct evidence of conspiracy, had the burden of showing that a refusal to deal with Dreisbach contradicted PAD's economic interests. Dreisbach submitted no evidence that any Carrier stood either to gain or lose by continuing to employ only Murphy's devanning services. PAD says the evidence shows legitimate business reasons for continuing to use Murphy: (1) Murphy developed off-dock devanning and was the first to implement it in Los Angeles; (2) as implemented by Murphy, the off-dock system was a significant improvement over the previous method; (3) when Dreisbach arrived on the scene, PAD and Murphy enjoyed a five-year business relationship; (4) Dreisbach offered no price reduction or other tangible benefit as an inducement to switch from Murphy; and (5) Dreisbach's facility was 15 miles farther from PAD's pier than Murphy's facility. In sum, PAD urges that the holding in Blair Foods, Inc. v. Ranchers Cotton Oil, 610 F.2d 665, 672 (9th Cir. 1980) is dispositive of all claims against it: "Summary judgment may properly be granted in an antitrust action on an allegation of conspiracy where there are understandable and legitimate business reasons for a defendant's conduct"
 
 
 [12]
 Having properly dismissed Counts 1-4 of Dreisbach's amended complaint, the district court exercised sound discretion in dismissing the remaining pendent claims based on state law. United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); Wham-O-Mfg. Co. v. Paradise Mfg. Co., 327 F.2d 748, 752-54 (9th Cir. 1964)
 
 
 [1]
 I do not believe that this issue should be disposed of on the basis of ambiguous and confusing statements as to the nature of the appellants' claim made by counsel at the hearing on summary judgment in the district court. I do not find anything that can fairly be construed as a waiver of Dreisbach's claim that he had been subjected to a boycott