NATIONAL CLASSIFICATION COM-
MITTEE and National Motor Freight
Traffic Association, Inc., Petitioners,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

No. 83–1474.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 3, 1984.

Decided Oct. 26, 1984.

John R. Bagileo, Washington, D.C., with
whom William W. Pugh, Bryce Rea, Jr. and
Leo C. Franey, Washington, D.C., were on
the brief, for petitioners.

Henri F. Rush, Associate Gen. Counsel,
Interstate Commerce Com'n, Washington,
D.C., with whom John Broadley, Gen.
Counsel, Sidney L. Strickland, Jr., Atty.,
Interstate Commerce Com'n, John J. Pow-
ers and Robert J. Wiggers, Attys., Dept. of
Justice, Washington, D.C., were on the
brief, for respondents.

Before WALD, BORK, and STARR, Cir-
cuit Judges.

Opinion for the Court filed by Circuit
Judge BORK.

BORK, Circuit Judge:

Petitioners National Classification Com-
mittee ("NCC") and National Motor

Freight Traffic Association, Inc. ("NMFTA") appeal from an order of the Interstate Commerce Commission interpreting an agreement made pursuant to former section 5a of the Interstate Commerce Act, recodified as amended at 49 U.S.C. § 10706 (1982). That section, enacted by Congress in 1948, ch. 491, 62 Stat. 472, provided that any carrier party to an agreement among carriers about "rates, fares, classifications, divisions, allowances, or charges ... or rules and regulations" relating to those subjects could apply to the Commission for approval of the agreement. Commission approval gave the parties antitrust immunity for the making of the agreement.[1]

The agreement in question here was made between motor carrier members of NMFTA and approved by the ICC. It provides for collective action with respect to freight classification matters. The Commission held that the agreement did not authorize various charges and rules promulgated by petitioners and ordered them stricken from the agreement. We affirm the Commission's order but hold that it does not operate retroactively to expose the parties to the agreement to antitrust liability for rules made in the past.

## I.

Pursuant to the statute, in 1954 petitioner NMFTA presented the ICC with a proposed agreement which would govern classification matters among NMFTA members. The purpose of a freight classification is to assign each article or group of articles with comparable transportation characteristics to a class. These assignments are made according to well-known classification principles which are based upon distinctions relative to transportability, such as shipping weight, perishability, ease or difficulty of loading, and stowability. *See Class Rate Investigation*, 262 I.C.C. 447, 508 (1945). Once a classification rating is assigned, the price of class rated transportation can be established by examining a separate, class rate tariff which provides the rate for transporting an article of a given class between origins and destinations. Class rate tariffs are published by regional rate bureaus or individual carriers.

NMFTA's 1954 proposed agreement was rejected by the ICC as "not ... in furtherance of the national transportation policy ...." *National Motor Freight Traffic—Agreement*, 292 I.C.C. 45, 52 (1954). The Commission viewed the proposal as too broad because it attempted to set not only the particulars of classification practices, but also announced a system for joint consideration of traffic problems of general concern to the industry. *Id.* at 49.

**1.** The relevant provisions of section 5a read as follows:

§ 5a(2) Application to commission for approval of agreements; rules and regulations

Any carrier party to an agreement between or among two or more carriers relating to rates, fares, classifications, divisions, allowances or charges (including charges between carriers and compensation paid or received for the use of facilities and equipment), or rules and regulations pertaining thereto, or procedures for the joint consideration, initiation, or establishment thereof, may, under such rules and regulations as the commission may prescribe, apply to the commission for approval of the agreement, and the commission shall by order approve any such agreement (if approval thereof is not prohibited by paragraph (4), (5), or (6)) if it finds that, by reason of furtherance of the national transportation policy declared in this act, the relief provided in paragraph (9) should apply with

respect to the making and carrying out of such agreement; otherwise the application shall be denied. The approval of the commission shall be granted only upon such terms and conditions as the commission may prescribe as necessary to enable it to grant its approval in accordance with the standard above set forth in this paragraph.

. . . .

(9) Relief from operation of antitrust laws.

Parties to any agreement approved by the commission under this section and other persons are, if the approval of such agreement is not prohibited by paragraph (4), (5) or (6), hereby relieved from the operation of the antitrust laws with respect to the making of such agreement, and with respect to the carrying out of such agreement in conformity with its provisions and in conformity with the terms and conditions prescribed by the commission.

Ch. 491, § 5a, 62 Stat. 472 (1948).

NMFTA returned to the Commission with a redrafted agreement in 1956, and this time the Commission granted approval. *National Classification Committee— Agreement*, 299 I.C.C. 519 (1956). While not as ambitious as the earlier proposal, the 1956 agreement was still sweeping:

> The agreement establishes a code of procedure which enables applicants to utilize an effective means for joint consideration, initiation, and establishment of classification matters. It furnishes a means to avoid destructive competition, promote sound economic conditions, protect shipping interests, and allow carriers an independence of action, free and unrestrained. The collective procedure in conformity with the terms of the agreement is not prohibited by any provisions of section 5a and it will aid motor carriers to maintain reasonable and nondiscriminatory classifications of property in furtherance of the national transportation policy.

*Id.* at 522.

The agreement was, of course, subject to amendment to take account of new developments and concerns. In schedules filed to become effective on May 5, 1978, NMFTA proposed to publish in the Classification Tariff on behalf of its member carriers an extra charge of $2.00 per shipment on what are called "order-notify" shipments when such shipments weighed 10,000 pounds or less. An order-notify shipment is one in which a carrier, upon its issuance of a negotiable, order-notify bill of lading, becomes obliged to retain possession of the goods shipped until the original bill is surrendered to it prior to delivery. According to petitioners, the order-notify bill is "another form of the more familiar c.o.d. shipment, with the difference being that the carrier collects the price of the goods before delivery in the case of c.o.d. shipments, whereas the consignor collects the price of the goods before the carrier can deliver in the case of order-notify shipments. In either case, the carrier is liable for loss of the goods if delivery is accomplished without prior collection of the price of the goods." Brief for NCC and NMFTA at 11–12 (citation omitted).

Some parties objected to NMFTA's proposal, and by order of May 2, 1978, the ICC suspended the operation of the proposed schedules and instituted an investigation into their lawfulness. The Commission requested that parties to the investigation address such issues as (1) whether the proposed charge was just and reasonable; (2) whether the charge was within the jurisdictional scope of the 1956 agreement, and (3) whether the NMFTA agreement procedures give participating carriers adequate time to publish provisions elsewhere to continue order-notify service without assessing the new $2.00 charge. The Commission stated that the 1956 agreement "is limited to the joint consideration of classification ratings, rules and regulations." Joint Appendix at 2a (hereinafter "J.A."). As a result of the investigation, the ICC "ordered the proposed schedules cancelled. It found that NMFTA had not shown the proposed charge to be cost-justified, *i.e.,* just and reasonable in amount. In addition, the Commission concluded that it would be contrary to the purpose for which the Commission had originally approved the NMFC [National Motor Freight Classification] Agreement to interpret it to permit the collective establishment of an order-notify charge." Brief for ICC at 11; *see* J.A. at 248a, 320a.[2] The Commission

---

2. The Commission wrote:

> Respondents also argue ... [that] they have not exceeded the scope of their agreement. Respondents' agreement does not specifically authorize the establishment of rates and charges, and respondents do not dispute this fact. Nonetheless, they claim that the authorization for joint consideration by members of rules and regulations, includes establishing related charges. In our opinion, such an interpretation is contrary to the purpose of the classification.
>
> As far back as *Class Rate Investigation, 1939*, 262 I.C.C. 447, 508 (1945), the Commission stated that the primary purpose of a freight classification is to assign each article, or group of articles, to a class according to well-known classification elements from a transportation standpoint. These considerations do not include how it may affect the rate

noted that "the purpose of classification is to assign articles to classes which reflect characteristics of commodities in relation to each other, and not to set the rate level for the shipment of such commodities." Brief for ICC at 11; see J.A. at 320 For that reason, the ICC found that "inserting the proposed charge in the classification tariff imputes the characteristics of a rate tariff to the classification tariff...." Brief for ICC at 11; see J.A. at 321a.

The NMFTA appealed the decision to this court. In National Classification Committee & National Motor Freight Traffic Association, Inc. v. ICC, No. 79-2561 (D.C. Cir. Dec. 16, 1980), we affirmed the Commission's order cancelling the order-notify charge as not just and reasonable but remanded the case for reconsideration of the question whether such a charge could properly be included within the scope of a section 5a agreement. The court found the record inadequate because the Commission had not adequately set forth the factual and policy basis for its decision. "There is, for example, no discussion by the Commission indicating the extent to which its decision affects similar charges ... which are already included within the agreement as approved; nor is there any explanation of the apparent inconsistency between the inclusion of such charges and the exclusion of a charge for order-notify shipments." Mem. op. at 1–2. The court asked that the Commission "clarify with adequate factual and legal analysis its position indicating what types of order-notify or other special charges are deemed appropriate or inappro-

priate under the Section 5a agreement." Id. at 2.

On March 22, 1983, the Commission issued the decision now under review. J.A. at 589a–603a. The ICC reviewed all facets of the 1956 agreement for the purpose of weeding out portions of that agreement which did not involve classification matters and which had thus not been contemplated by the 1956 agreement. The Commission decided that "[u]pon reopening, we conclude that the promulgation of the proposed order-notify rule and charge is not within the scope of the NMFTA's section 5a agreement. In addition, we find that the NCC currently publishes a number of other rules and charges in the NMFC which are unrelated to classification and, as a consequence, exceed the scope of the NMFTA's agreement." J.A. at 590a–591a. The ICC was careful to note that the agreement and the NCC had legitimate functions:

We do not question the NCC's authority to promulgate rules and regulations, regardless of whether the power is inferred from the title and preamble or inherent in respondent's authority to maintain a classification. We question respondent's authority to promulgate charges in the context of rules that are intended to govern the classification. Under Section 5a, motor carriers could enter into agreements to consider both rates and charges, provided these powers were specified in an agreement approved by the Commission. Respondent's agreement is specific as to classification and

---

level.... Furthermore, in General Increase—Eastern Central Territory, 316 I.C.C. 467, 483 (1962), it was made clear that the classification publication and the class tariff serve entirely different purposes. The classification is designed to reflect the characteristics of a commodity in relation to other commodities, whereas the tariff reflects the characteristics of the haul between origin and destination. This would include accessorial service in connection with providing transportation. Respondents are violating the purpose of the classification by including charges in it and are, consequently, imputing to the classification the characteristics of the rate tariff.

Respondents attempt to justify their interpretation on the ground that publishing charges in the classification would provide nationwide uniformity in the application of such charges. However, this begs the question. Even if a desirable purpose might be served by publishing charges in the classification, it still would not justify violation of the agreement.

Further, publication of accessorial charges in the classification may not be desirable since it causes fragmentation of rates and charges. A shipper cannot determine from the pertinent rate tariffs what its total costs will be.

J.A. at 320a–321a.

silent as to rates and charges. This silence cannot be circumvented by placing rates and charges in rules governing the classification.

J.A. at 591a. The Commission was emphatic that classification matters and rate matters fall in distinct categories. "[W]e do not see how charges can relate to the classification. Rates and charges belong in rates tariffs, while the power to set rates and charges resides with the individual carriers and their regional rate bureaus." *Id.* at 592a–593a. The NMFTA could have sought authority to set such rates as it proposed in the order-notify charge but, since it did not do so, "the antitrust immunity respondent sought and received was limited (1) to the establishment and maintenance of a classification, (2) to the adoption of rules and regulations pertaining to the classification, and (3) to the adoption of procedures for the joint consideration, initiation or establishment of the classification or rules and regulations pertaining to it." *Id.* at 593a. The Commission continued:

> Accordingly, we conclude that for now and in the future, NCC's substantive antitrust immunity is limited to the promulgation of classifications and rules and regulations relating to the classification. Rules and charges, other than those prescribed by us, that do not contribute to the actual establishment, implementation and/or understanding of the classification exceed the scope of respondent's antitrust immunity and must be expunged from the NMFC.

*Id.* at 596a–597a. The Commission also ordered stricken from the agreement a variety of other items which, like the order-notify charge, had nothing to do with classification.[3]

The Commission views its action as compliance with the mandate of the remand, a mandate the agency reads as requiring a harmonizing of its earlier decision to strike order-notify charges from the agreement with the inclusion in the same agreement of other similar charges and rules. This it has done, the agency concludes, by requiring deletion from the agreement of a number of nonclassification-related matters.

## II.

The parties disagree about the role of this court in reviewing the decision of the ICC. Petitioners admit that some degree of deference may be due the agency, but contend that here the appropriate degree is next to zero. Little in the way of support for this position is offered, other than reference to the Ninth Circuit's decision in *Driesbach v. Murphy*, 658 F.2d 720 (1981). But *Driesbach* concerned the doctrine of primary jurisdiction, and the court refused to invoke the doctrine because it was presented with an agreement whose plain language rendered unnecessary a resort to the agency's expertise. *Id.* at 725. Here, by contrast, the court must review an agency's interpretation of an agreement that is pervaded with technical detail and nuance. "There is room for deference to the agency on the interpretation of industry agreements ...." *Cargill, Inc. v. FMC*, 530 F.2d 1062, 1067 (D.C.Cir.1976). What we seek, therefore, is not a decision with which we wholeheartedly agree, but one which "did provide a reasonable and consistent interpretation of the agreement." *Gulf States Utilities Co. v. FPC*,

---

**3.** The stricken items included:
Item 360 Sec. 1(f) (charges to documents, forms and copies)
Item 430 (Collect on Delivery (COD) Shipments)
Item 500 (Detention—Vehicles with Power Units)
Item 501 (Detention—Vehicles without Power Units)
Item 503 (Prearranged Scheduling of Vehicle Arrival for Loading or Unloading)
Item 520 (Equipment)

Item 770 (Prepayment or Guarantee of Charges)
Item 780 (Prohibited or Restricted Articles)
Item 995 Sec. 3(b) (labor charge)
J.A. at 601a. The Commission also ordered stricken the agreement's provisions that established numerous minimum charges for specific items, concluding that "[t]hese minimum charges are clearly matters of ratemaking and as such are beyond the jurisdiction of the NCC." *Id.*

518 F.2d 450, 457 (D.C.Cir.1975). We must affirm that decision if the record supports it and it is not arbitrary and capricious.

## III.

◼ Clearly, the ICC decision is an important one, disturbing practices which have gone unchallenged for well over two decades. It is doubtful that this court imagined that its earlier remand would result in such sweeping changes. It is likewise clear that the ICC has carefully endeavored to complete the task assigned it by the court. Because we find the Commission's decision fully supported by the record, completely and coherently explained, and not arbitrary and capricious, we affirm its power to strike nonclassification matters from the agreement.

While the decision advances a number of arguments, the Commission's primary rationale is that the agreement approved in 1956 contemplated only joint action in the establishment of classification matters, and that the items it has ordered stricken are not such matters but rather govern *rates* assessed the transportation of goods. We agree with the ICC that "the fundamental issue in this case is the scope and purpose of the NMFC agreement." Brief for ICC at 33. Confusion arises because the 1956 agreement approved by the ICC related to "procedures for the joint consideration, initiation, or establishment of classification ratings, *rules, and regulations*, hereinafter called classification matters ...." *National Classification Committee— Agreement*, 299 I.C.C. 519, 519 (1956) (emphasis added). Petitioners argue that the items ordered stricken *are* rules and regulations governing classification matters. The Commission disagreed, concluding that the agreement had come to harbor hidden rate charges that had nothing to do with the classification of goods by characteristics of transportability. Others shared this view. *See, e.g.,* Comments of Outboard Marine Corp., J.A. at 364a–365a; Comments of the National Industrial Traffic League, J.A. at 377a ("Characteristics examined to determine classification ratings

should reflect the actual nature of the transportation. The transportation characteristics relevant to classifications, however, do not include ratemaking characteristics and variables.").

The heart of the Commission decision is its explanation of why rule-related charges, such as the order-notify charge, are not "classification matters":

[R]espondent observes that the cost of additional services such as order-notify and C.O.D. do not vary significantly by commodity type. Accordingly, respondent asserts that it is more practical and effective to determine the costs of the additional handling characteristics involved in providing additional services and translate those costs into minimum charges in conjunction with a nationwide rule.

J.A. at 595a.

The Commission disagreed:

*The very fact that the costs of the additional services, represented as rule-related charges, cannot be expressed in terms of the classification indicates that in actuality they bear little if any relevance to the classification and do not belong in the NMFC. It is of little consequence that these additional services have costs that may relate to certain classification characteristics.*

*Id.* (emphasis added). Obviously the charges are related to classification characteristics—exposure to liability is the clearest example. But they are not themselves express differences in characteristics, a fact demonstrated by the admission that . "the cost of additional services ... do not vary significantly by commodity type." The relevance of the charges to classification characteristics does not turn the charges themselves into such characteristics. The ICC is here defining the concept of classification matters. It has determined to end the erosion of that concept by cleansing the agreement of charges that, while tangentially related to the characteristics of transportability, are not themselves the prime ingredients of transportability. We cannot say that the agency's

definition of the concept is wrong. On the contrary, its explanation is quite reasonable, its analysis of the agreement thorough, and its results internally consistent. A great deal of expertise is necessary to the elimination of marginally relevant charges, and we defer to that expertise.

The problem the Commission confronted is similar to that presented in *United States v. Western Pacific R.R.*, 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956), where the Supreme Court reviewed a Commission interpretation of tariff language. The question there was whether certain articles constituted "incendiary bombs" and thus fell into the tariff category covering such bombs. The Supreme Court felt compelled to defer to the agency's interpretation in that case, stating:

> To answer [the] question there must be close familiarity with these factors [that compel a higher tariff for incendiary bombs]. Such familiarity is possessed not by the courts but by the agency which had the exclusive power to pass on the rate in the first instance. And, on the other hand, to decide the question of the scope of this tariff without consideration of the factors and purposes underlying the terminology employed would make the process of adjudication little more than an exercise in semantics.

*Id.* at 67, 77 S.Ct. at 167. Similarly, we are here presented with delicate questions of language. That language is not the ordinary variety, but is rather a type developed by specialists for interpretation by specialists. We will not interfere with the Commission's determination of what constitutes a true classification matter when that determination is, standing alone and unaided by judicial deference, reasonable, and in fact, compelling. The decision that accessorial charges and minimum charges may be stricken from the agreement is thus affirmed.

## IV.

■ We judge that the agency's decision here was a difficult one. It is clearly a great departure from the agency's prior interpretation of the agreement. We are astonished, therefore, by the ICC's statement that "[w]e recognize in this context that the Commission's ruling may expose NMFTA's members to potential antitrust liability for past practices." Brief for ICC at 37. We cannot agree that adherence to these practices in the past now exposes these carriers to retroactive antitrust liability. The Commission has reversed itself. It is certainly free to correct what it now perceives to be a misinterpretation of the 1956 agreement, but that should not expose to liability all those who acted on the prior interpretation. The carriers enjoyed immunity only because the Commission proclaimed immunity through its long-standing practical construction of the agreement. We do not view this as an invocation of the estoppel doctrine. It is rather a recognition that agency decisions may be inferred from long-standing practice.

The ICC argues that it is well settled "that an agency does not by acceptance of tariff filings approve the lawfulness of the contents of those filings." Brief for ICC at 22. This is, of course, correct. But the ICC plays fast with the description of what has actually occurred over the last quarter century. We are not dealing with a mere tariff filing, but with the continuous operation of an agreement central to the viability of the carriers conducting business under its guidelines. Nor is the consequence these carriers face remotely similar to that felt by an applicant that has a tariff filing rejected. In the latter case perhaps a refund order would follow. But with our case, the carriers would find themselves open and vulnerable to private antitrust actions that could permanently disable many of them.

We cannot ignore what amounts to a lengthy period of awesome inaction on the part of the agency. This is a very old agreement. Its pedigree is not in dispute. The agency, and the Congress, have been aware of its operation for nearly thirty years. Now the agency offers an interpretation fundamentally at odds with that which its consistent past behavior defined as the scope of the agreement.

Administrative inaction can and has produced a consistent practical construction. The agency charged with the application of the law and the interpretation of the agreement for these many years should not now be heard to say that its continuous acceptance of rules and regulations of a particular type did not constitute any sort of an interpretation. Whether or not that trenches on bad faith, it is certainly bad law. Most recently the Supreme Court was called to reconcile a new interpretation of a statute at odds with prior administrative inactivity. After sixty years of unconcern, the United States attempted to sue various parties under section 8 of the Clayton Act, which, the government argued, prohibited interlocking directorates among banking and insurance companies. Such directorates had long been in existence, and the Court rejected the government's attempt to ignore its own record in the area. The reasoning is so pertinent here that we quote from the opinion at length.

In rejecting the Government's present interpretation of Section 8, we by no means depart from our long-held policy of giving great weight to the contemporaneous interpretation of a challenged statute by an agency charged with its enforcement, *e.g., Edwards' Lessee v. Darby,* 25 U.S. (12 Wheat.) 206, 210, 6 L.Ed. 603 (1827). But the Government does not come to this case with a consistent history of enforcing or attempting to enforce Section 8 in accord with what it urges now. On the contrary, for over 60 years, the Government made no attempt, either by filing suit or by seeking voluntary resignations, to apply Section 8 to interlocks between banks and nonbanking corporations, even though interlocking directorates between banks and insurance companies were widespread and a matter of public record throughout the period. We find it difficult to believe that the Department of Justice and the Federal Trade Commission, which share authority for enforcement of the Clayton Act, and the Congress, which oversees those agencies, would have overlooked or ignored the pervasive and open practice of interlocking directorates between banks and insurance companies had it been thought contrary to the law.

It is true, of course, that "[a]uthority granted by Congress ... cannot evaporate through lack of administrative exercise," *FTC v. Bunte Brothers, Inc.,* 312 U.S. 349, 353, 61 S.Ct. 580, 582, 85 L.Ed. 881 (1941); the mere failure of administrative agencies to act is in no sense "a binding administrative interpretation" that the Government lacks the authority to act. *United States v. E.I. duPont de Nemours & Co.,* 353 U.S. 586, 590, 77 S.Ct. 872, 875, 1 L.Ed.2d 1057 (1957). However, "just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *FTC v. Bunte Brothers, Inc., supra.* Similarly, in *FTC v. Panhandle Eastern Pipeline Co.,* 337 U.S. 498, 513, 69 S.Ct. 1251, 1260, 93 L.Ed. 1499 (1949), this Court held that "failure to use such a power for a long time indicates to us that the Commission did not believe the power existed." In the circumstances of this case, the Government's failure for over 60 years to exercise the power it now claims under Section 8 strongly suggests that it did not read the statute as granting such power.

When a court reaches the same reading of the statute as the practical construction given it by the enforcing agencies over a 60 year span, that is a powerful weight supporting such reading. Here, moreover, the business community directly affected *and* the enforcing agencies *and* the Congress have read the statute the same way for 60 years....

It is not surprising that for more than a half century literally thousands of citizens in the business world have served as directors of both banks and insurance companies in reliance on what was universally perceived as plain statutory language. These citizens were reassured

that the Government's reading of that language indicated that their conduct was lawful. The Government brushes this aside, saying in effect that it will not bring suits against those directors who resign within a reasonable time.... However, those who elect to resign under this "amnesty" would nonetheless carry a stigma of sorts as violators of federal laws. Equally, and perhaps more important, such persons face possible civil liability in unknown amounts, liability against which the Government cannot, and does not purport to, render them immune.... While it is arguable that wise antitrust policy counsels against permitting interlocking directorates between banks and competing insurance companies, that policy must be implemented by Congress, and not by a crabbed interpretation of the words of a statute which so many in authority have interpreted in accordance with its plain meaning for so long. If changes in economic factors or considerations of public policy counsel the extension of the Clayton Act to the categories of interlocking directorates implicated here, it is a simple matter for Congress to say so clearly. *Bankamerica Corp. v. United States*, 462 U.S. 122, 103 S.Ct. 2266, 2271–73, 76 L.Ed.2d 456 (1983) (footnotes omitted) (citations omitted).

*Bankamerica* is in many ways similar to this case. While here the agency is reinterpreting an agreement and not a statute, it cannot thus escape the implications of the Supreme Court's discussion. For many years the carrier community has engaged in the open conduct of abiding by the agreement—a practice that has gone unchallenged even as the practice of interlocking directorates at issue in *Bankamerica* had gone unchallenged. A "practical construction" of the agreement thus evolved. "These citizens were reassured that the Government's reading of that language indicated that their conduct was lawful." *Bankamerica*, 103 S.Ct. at 2273. The ICC lacks any justification for its attempt to leave open the question of antitrust liability for past acts by the carriers

which were in accord with the agreement. With this proviso, we affirm the decision of the ICC.