843 F.2d 886
 CENTRAL AND SOUTHERN MOTOR FREIGHT TARIFF ASSOCIATION, INC.,
Petitioner,
v.
UNITED STATES of America & Interstate Commerce Commission, Respondents,
National Small Shipments Traffic Conference, Inc. & The Drug
and Toilet Preparation Traffic Conference, Inc.,
Intervenors-Respondents.
 Nos. 86-3460, 86-3568.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 14, 1987.
Decided March 29, 1988.
 
 John M. Womack, Louisville, Ky., Bryce Rea, Jr., Patrick McEligot (argued), Washington, D.C., for petitioner.
 Edwin Meese, III, Atty. Gen., U.S. Dept. of Justice, Robert S. Burk, Gen. Counsel, ICC, Evelyn G. Kitay (argued), Washington, D.C., for respondents.
 Daniel J. Sweeney, Washington, D.C., for intervenors-respondents.
 Robert B. Nicholson, John P. Fonte, Dept. of Justice, Washington, D.C., for U.S.
 Leonard A. Jaskiewicz, Grove, Jaskiewicz, Gilliam and Cobert, Washington, D.C., for amicus curiae Bulk Carrier.
 Before KEITH, KENNEDY and NORRIS, Circuit Judges.
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 These two consolidated cases, each of which seeks review of two final orders of the Interstate Commerce Commission ("Commission"), require us to determine whether the Commission is correct in its application of the Motor Carrier Act of 1980, Pub.L. No. 96-296, 94 Stat. 793 (codified as amended in scattered sections of 49 U.S.C.) ("the Act"), to two tariffs filed with the Commission by the petitioner, Central and Southern Motor Freight Tariff Association, Inc. ("CSMFTA"). One of the tariffs established delivery charges for certain counties in eastern Kentucky. The other established charges for residential pick-up and delivery service within the entire ratemaking territory of CSMFTA. The Commission, in response to protests by shippers to whom the proposed charges would apply, rejected both tariffs. The Commission decided that approval of CSMFTA's proposed tariffs would result in a clear violation of the Act's prohibition against collective ratemaking of single-line rates,[1] and did not fall within any of the Act's exceptions to that prohibition.
 
 I. BACKGROUND
 
 2
 CSMFTA is an organization formed, under Sec. 10706(b)(2) of the Revised Interstate Commerce Act, 49 U.S.C. Sec. 10706(b)(2), by agreement of motor common carriers of property operating in interstate and foreign commerce, pursuant to Certificates of Public Convenience and Necessity issued by the Commission. Such organizations are commonly known as rate bureaus.
 
 
 3
 A primary function of CSMFTA as a rate bureau is to serve as a forum for the collective establishment of the rates published in the common tariffs of motor common carriers of general commodities. In the exercise of this function, CSMFTA and its carrier principals operate with immunity from the antitrust laws.
 
 
 4
 CSMFTA filed petitions for review of the Commission's orders rejecting the tariffs filed by CSMFTA on behalf of all of its members, except those members who had previously "flagged out" by exercising their independent right of action under 49 U.S.C. Sec. 10706(b)(3)(B)(ii).[2] Upon request of CSMFTA, the petitions have been consolidated since both involve the same issues of law.
 
 
 5
 (A) The Tariffs
 
 
 6
 (1) The Collectively Set Delivery Charges at Eastern Kentucky, C & SMFTA Proceedings (I & S Docket No. M-30374) ("Eastern Kentucky Proceedings")
 
 
 7
 On July 26, 1985, CSMFTA filed with the Commission a tariff fixing the price for certain delivery charges, which was proposed to become effective August 25, 1985. The tariff provided that all members of CSMFTA would charge ten percent of the otherwise applicable line-haul rate as an additional delivery charge on shipments weighing less than 20,000 pounds (i.e., less than truckload shipments), moving from points in Illinois, Indiana, Michigan, Ohio, or Wisconsin, to points in thirty-eight contiguous, sparsely populated counties in eastern Kentucky. The tariff provided that the additional charge would accrue to the delivering carrier. Two carriers exercised their right of independent action and flagged out of the tariff.
 
 
 8
 CSMFTA argued that the tariff increase was justified because that part of eastern Kentucky generated no significant outbound freight available to general commodities carriers, which have to return their equipment empty, or nearly empty, to some more populated place, such as Cincinnati or Louisville. The reason stated for publishing the increase as a percentage was that, if it had been published in the tariff as an increase in line-haul rates, the carriers serving eastern Kentucky, in joint-line service, would have been required to adjust their formulas for determining divisions of revenue among themselves to assure that the delivering carrier--the carrier which had the imbalance of traffic--would get the additional revenue needed to compensate for the imbalance. CSMFTA contends that, while only a few carriers serve the imbalanced area, hundreds of carriers are involved in joint-line movements with them, and a large number of agreements would be affected.
 
 
 9
 (2) The Pick-Up and Delivery at Private Residences Proceedings (I & S Docket No. M-30376) ("Residential Proceedings")
 
 
 10
 CSMFTA also, by a tariff filing proposed to become effective October 20, 1985, fixed the prices to be charged by each of its member carriers for residential pick-up or delivery service within the entire CSMFTA ratemaking territory. A few carriers also flagged out of this tariff.
 
 
 11
 CSMFTA contends that several factors distinguish service for commercial enterprises from service for private residences and other similar non-business locations. It argues that, since non-business locations are not reliably open and available for pick-up or delivery service, special arrangements must be made by the carrier before that service can be performed; that private residences have no loading or unloading facilities and often landscaping and design make residential pick-up and delivery service difficult and time consuming; that private residences are usually located outside the business district and are often subject to practical as well as legal impediments to pick-up and delivery service, including vehicle size and weight limitations; that residential shipments must be segregated from the flow of other freight and stored at the carrier's terminal facilities until delivery can be made; and that non-business customers are unfamiliar with tariffs, shipping documents, and payment terms and conditions and, as a result, demand more time and attention than commercial shippers.
 
 
 12
 In both of the above proceedings, the Commission suspended the tariffs and conducted an investigation into all issues relating to the lawfulness of the schedules filed. In each proceeding, the Commission concluded that the charges were single-line rates established by prohibited collective ratemaking procedures. The Commission rejected the arguments of CSMFTA that the charges were valid under three of the four Section 10706(b) exceptions to the prohibition against collective single-line ratemaking: the subparagraph (i) exception for general rate increases or decreases; the subparagraph (iii) exception for changes in tariff structures; and the subparagraph (iv) exception for changes in rules and regulations.[3]
 
 
 13
 (B) The "Niagara" Proceedings
 
 
 14
 Prior to the commencement of these proceedings, the Commission, in Collective Ratemaking Procedures--Niagara Frontier Tariff Bureau, Inc., 1 I.C.C.2d 317 (1984) ("NFTB"), aff'd per curiam, Niagara Frontier Tariff Bureau, Inc. v. United States, 780 F.2d 109 (D.C.Cir.1986) ("Niagara I "), defined "single-line rate" as "a rate for service performed wholly by one carrier as opposed to a rate for service performed by two or more carriers."
 
 
 15
 In Niagara I, the court of appeals granted leave to CSMFTA and a number of other rate bureaus to intervene as parties. The government argues that, by reason of CSMFTA's intervention as a party in Niagara I, it is collaterally estopped from relitigating, in this circuit, its challenge of the Commission's interpretation of the statutory definition of single-line rates.
 
 
 16
 In Niagara Frontier Tariff Bureau, Inc. v. United States, 826 F.2d 1186 (2d Cir.1987) ("Niagara II "), the court held that Niagara I barred Niagara Frontier Tariff Bureau, Inc., from relitigating in another circuit its challenge of the Commission's interpretation of single-line rates. Because we reach the same conclusion on the merits as Niagara I, it is unnecessary for us to determine whether collateral estoppel (issue-preclusion) also bars a rate bureau that intervened at the appellate level in Niagara I from relitigating that issue in this circuit.
 
 
 17
 (C) Orders of the Commission
 
 
 18
 (1) The Eastern Kentucky Proceedings
 
 
 19
 In the eastern Kentucky proceedings, the Commission, following Niagara I, again ruled that a single-line rate is "a rate for service performed wholly by one carrier as opposed to a rate for service performed by two or more carriers," and held that Niagara I clearly establishes that the single-line prohibition applies whether or not other carriers provide the same single-line service at the same rate. The Commission restated the language that it had used in its NFTB decision:
 
 
 20
 The correct analysis, and the one we will use, focuses on whether a rate proposal is for single-line service; that is, for a single carrier's line where that carrier can perform the service from origin to destination. If the proposed rate would apply to another carrier's single-line operation, or would apply for both single-line and joint-line service, it is a single-line rate on which collective activity is barred. This interpretation is consistent with the Congressional intent, as expressed in section 10706(b), that motor carriers would set prices for their own services as do members of other industries.
 
 
 21
 Collectively Set Delivery Charges at Eastern Kentucky, C & SMFTA, I & S No. M-30374, slip op. at 6 (March 19, 1986).
 
 
 22
 The Commission also rejected CSMFTA's contention that the proposed tariff fell within an exception to the prohibition against collective single-line ratemaking. 49 U.S.C. Sec. 10706(b)(3)(D)(i), (iii), and (iv).
 
 
 23
 Accordingly, the Commission rejected the eastern Kentucky tariff as a violation of the Act and Commission regulations.
 
 
 24
 (2) The Residential Charges Proceedings
 
 
 25
 The Commission followed the same reasoning in applying the single-line rate prohibition to the charges for residential pick-up and delivery service. In doing so, it relied both upon Niagara I and on one of its prior decisions, Investigation Into Practices of Motor Common Carriers of Property on Residential and Redelivered Shipments, Ex Parte No. MC-97 (Sub. 2), 1985 Federal Carriers Cases, 47,558, 47,561, in which the Commission ruled that a "residential delivery charge is a single-line charge under 49 U.S.C. 10706(b)(1) to the extent service is rendered by a single carrier over its line for its own account. As such, collective action is prohibited under 49 U.S.C. 10706(b)(3)(D)." (Footnote omitted.)
 
 
 26
 The Commission again rejected CSMFTA's argument that the proposed tariff fell within an exception to the single-line ratemaking prohibition.
 
 
 27
 The Commission found in both proceedings that Congress has established a policy that individual carriers must determine their own rates in a competitive atmosphere, and accordingly rejected the schedules.
 
 
 28
 II. DISCUSSION OF THE COMMISSION'S INTERPRETATION
 
 
 29
 The standard for our review of a statutory interpretation by a federal agency charged with administering a statute is controlled by 5 U.S.C. Sec. 706. In Crounse Corp. v. I.C.C., 781 F.2d 1176 (6th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986), Judge Kennedy wrote:
 
 
 30
 Although substantially intertwined, our review of the Commission's interpretation of the statute naturally differs somewhat from our review of the Commission's application of the statute. While an agency's interpretation of a statute is entitled to deference, "federal courts bear the ultimate responsibility for interpreting federal statutes." Meade Township v. Andrus, 695 F.2d 1006 (6th Cir.1982). Our task, however, is not to determine whether we think the Commission's construction is the best construction, but only to determine whether the Commission's construction was "sufficiently reasonable." Train v. Natural Resources Defense Council, 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975). "To satisfy this standard it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding" Federal Election Commission v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981).
 
 
 31
 781 F.2d at 1183.
 
 
 32
 (A) The Commission's Interpretation is Reasonable
 
 
 33
 The Commission's construction of the Act's definition of single-line rate is a reasonable interpretation of the statutory language. The proposed charges, except for the fact that they have been adopted by several carriers rather than a single carrier, clearly fit within the definition. The rate proposed to be charged for each delivery covered by the tariff is a rate that each single member motor carrier proposes to charge each of its customers for transportation of that customer's property only over (from one point to another point on) that carrier's line. Obviously, the transportation can be provided by that carrier.
 
 
 34
 Whether or not such charges are proposed individually or collectively, only one carrier makes the charge and only one carrier provides the transportation. Construing the definition in pari materia with other relevant provisions of the Act, the term "proposed" refers to a filing with the Commission of a rate that is proposed to apply only to shippers who deliver property to that carrier for transportation over its line. The purpose of proposing the rate by such a filing is to permit shippers to exercise any legal rights they may have to protest the proposed rate and, if the rate is not in accordance with law, to require the Commission to reject it.
 
 
 35
 To construe "proposed by a single carrier" as the expression of a Congressional intent to exclude a rate "proposed by two or more carriers" would lead to an absurd result. Since the Act clearly prohibits an agreement that establishes a rate bureau from providing for the discussion of or voting upon single-line rates, the effect would be to attribute to Congress an intent that rate bureaus should be able to remove themselves from the operation of the law by the very act of violating it.
 
 
 36
 (B) The Commission's Interpretation Accords With the Statutory Policy
 
 
 37
 The Commission's construction of the definition accords with the national transportation policy of promoting competitive and efficient transportation services, as set forth in 49 U.S.C. Sec. 10101a. The Act specifically requires the Commission to assure that rate bureau agreements are not inconsistent with transportation policy, and authorizes the Commission to require rate bureaus to comply with reasonable conditions to assure that the agreements establishing them further transportation policy. 49 U.S.C. Sec. 10706(b)(2). The Commission's interpretation guarantees to shippers their right under the Act to have transportation charges fixed by competition and not by collective action.
 
 
 38
 Law established by the Reed-Bulwinkle Act, 62 Stat. 472 (1948), unchanged by the Act, prohibits rate bureaus from interfering with any carrier's right of independent action and from changing or cancelling any rate established by independent action after the enactment of that provision of the law. 49 U.S.C. Sec. 10706(b)(3)(B)(ii). Individual members of CSMFTA had the right, by independent action, not to adhere to the proposed tariffs and, in fact, some carriers initially did exercise that right by flagging out when the tariffs were submitted to them. However, the right of independent action affects competition only to the extent that it permits a carrier to price its transportation competitively. The Commission's interpretation of single-line rates correctly reflects a statutory policy of precluding carriers who do not wish to compete from combining to avoid competition.
 
 
 39
 (C) The Commission's Interpretation Accords With Legislative History
 
 
 40
 The Commission's interpretation is consistent with legislative history.
 
 
 41
 Members of both Houses of Congress had before them, prior to casting their votes, the report of the House Public Works and Transportation Committee ("House Report"), H.R.Rep. No. 1069, 96th Cong., 2d Sess. 1, reprinted in 1980 U.S.Code Cong. & Admin.News 2283.
 
 
 42
 The House Report explains the Act's application to collective ratemaking of the motor carrier industry:
 
 
 43
 The bill makes some important changes in the area of motor carrier pricing. The motor carrier industry now collectively sets rates it charges to the public. It does this under a grant of immunity from the antitrust laws. Section 14 of the bill limits the permissible scope of collective ratemaking. Beginning in 1984, carriers may not collectively vote on or discuss single-line rate proposals. However, carriers will be allowed to continue discussing and voting on general increases and decreases and some other matters, provided that any such discussion be limited to industry average carrier costs and not include discussions of individual markets or particular single-line rates.
 
 
 44
 Id. at 3-4, 1980 U.S.Code Cong. & Admin.News pp. 2285, 2286.
 
 
 45
 With respect to single-line rates, the House Report states:
 
 
 46
 Under the current statutes, the Interstate Commerce Commission has substantial discretion in approving or disapproving rate bureau agreements. The Commission has recently embarked upon a series of reviews of rate bureau agreements to determine whether they should be continued and, if so, under what conditions. The Commission has already announced that it has voted to eliminate immunity for single-line rate discussion and voting. In this context, the term "single-line rate" refers to a rate offered by a motor carrier of property that is applicable over its lines and which does not involve the services of any other carrier. Under current practices, most tariff rates are identical for both single-line and joint-line movements. Thus, when rate bureaus discuss individual rates, they generally do not distinguish between single-line and joint-line rates. This has not always been the case, however, and need not be in the future.
 
 
 47
 The Committee voted to implement a number of procedural reforms in the rate bureau process and, effective in 1984, to eliminate antitrust immunity for discussion or voting upon single-line rates. The Committee is aware of the fact that this will result in a significant change in the way that motor carriers price their services. It will mean that consideration of single-line and joint-line rates must be done separately. It will put a greater burden upon individual carriers to determine their own cost structures and the most optimum rates from their individual company point of view to offer the shipping public. But on balance, the Committee believes that there will be public benefits that outweigh the burdens of changing to a new system--namely, more competitive pricing.
 
 
 48
 The Committee believes that it is good policy to eliminate single-line rate immunity after a period of time. The existing system has operated for over 30 years and both carriers and shippers must be given sufficient time to adjust to the new environment. The elimination of antitrust immunity for single-line rates is one of the most important aspects of the legislation. (Emphasis added.)
 
 
 49
 Id. at 27-28, 1980 U.S.Code Cong. & Admin.News pp. 2309, 2310.
 
 
 50
 Of significance are the remarks of legislators who opposed the passage of the Act's provisions on single-line rates, since they interpreted the definition of single-line rate in the same way as did the majority. Senators Earnest F. Hollings and Daniel K. Inouye stated their view in the Minority Views of Messrs. Hollings and Inouye, S.Rep. No. 641, 96th Cong., 2d Sess. 80 (1980):
 
 
 51
 We are greatly concerned, however, with the additional "reform" to take place on July 1, 1983; that is, the ban on discussion of or voting upon single-line rates. The majority does not understand the full impact of the ban.
 
 
 52
 ....
 
 
 53
 ... As noted above, some 60 to 70 percent of all shipments move via single-line service. But the industry is capable of transporting almost all shipments origin to destination in single-line service. So the bulk of today's joint-line service provided is at the demand of shippers. If carriers are prohibited from establishing, collecting [sic], rates that simultaneously apply via single and joint-line service, the fear of violating the antitrust laws would compel them to publish joint rates and offer joint-line service only when they cannot offer single-line service.
 
 
 54
 ....
 
 
 55
 The single-line restriction will cause considerable volumes of motor carrier traffic moving today in joint-line service, but at single factor rates, to move at a combination of local rates. This means individual rates for each segment of the movement on separate bills of lading. This is more costly to the shipper and ultimately the consumer.
 
 
 56
 Id. at 112-113.
 
 
 57
 The senators would have had no reason to be so concerned if Congress had intended the statutory prohibition on discussion of, and voting upon, single-line rates to apply only to independent actions of a single motor common carrier.
 
 
 58
 (D) The Commission's Interpretation Accords With the Report of the Study Commission Created By the Same Act of Congress
 
 
 59
 The Commission's interpretation is also supported by post-enactment statements of the Motor Carrier Ratemaking Study Commission ("Study Commission") created by section 14(b) of the Act. The members of the Commission included Senators Robert W. Packwood, Howard W. Cannon, Barry M. Goldwater and Edward M. Kennedy, and Congressmen Robert A. Rowe, John F. Seiberling and E.G. "Bud" Shuster. These members of Congress had been instrumental in the passage of the Act.
 
 
 60
 The Act specifically made the effective date of the prohibition of discussion of, or voting upon, single-line rates dependent upon the date on which the Study Commission submitted its final report. 49 U.S.C. Sec. 10706(b)(3)(D). Section 14(b)(2)(A)(i) of the Act required the Study Commission to make a full and complete investigation and study of the collective ratemaking process for all rates of motor common carriers of property and to report upon the possible need for continued antitrust immunity. Accordingly, some weight may be given to the Study Commission's post-enactment statements. During its deliberations, proponents of collective ratemaking urged upon the Study Commission an interpretation similar to CSMTFA's interpretation of the statutory definition of single-line rates. In response, the final report of the committee states:
 
 
 61
 The proponents of collective ratemaking have raised a question regarding the definition of single-line rates. Newly enacted subsection 10706(b) defines a single-line rate as "a rate, charge, or allowance proposed by a single motor common carrier of property that is applicable only over its line and for which the transportation can be provided by that carrier." The subsection goes on to forbid collective consideration of single-line rates commencing in 1984.
 
 
 62
 The purpose of subsection 10706(b), the industry asserts, is merely "to underscore and reinforce the carriers' right of independent action." It is the industry's contention that under the Motor Carrier Act of 1980 definition, "a single-line rate literally is the equivalent of a rate established by independent action." In other words, the industry would have the Study Commission accept the proposition that Congress prohibited something which the carriers have never been permitted to do--namely, to consider collectively the rates that they have always been required to establish independently.
 
 
 63
 Besides being intuitively difficult to accept, the industry's position is inconsistent with any of the accepted rules of statutory construction. When the definition of single-line rate is construed in context with subsection 10706(b)'s remaining paragraphs--as it must be--it is clear that Congress was simply speaking of a rate applied to a movement between two points on one carrier's line when it prohibited discussion and voting on single-line rates. Single-line rates can be established either collectively or independently. When Congress spoke of "a rate ... proposed by a single motor common carrier ... applicable only over its line," it was not, by use of the word "only," trying to equate a single-line rate with an independent action, but rather to distinguish between single-line rates which apply to movements between two points on one carrier's line, and joint-line rates which apply to movements over two or more carriers' lines. The reason for making the distinction, of course, is that the subsection goes on to prohibit the collective establishment of single-line rates (leaving carriers free to set joint-line rates collectively), while at the same time reinforcing the carriers' right to set single-line rates independently free from rate bureau interference. (Footnotes omitted.)
 
 
 64
 Motor Carrier Ratemaking Study Comm'n, Collective Ratemaking in the Trucking Industry at 497-99 (1983).
 
 III. DISCUSSION OF CSMFTA'S ARGUMENTS
 
 65
 (A) Deference To Be Given To Commission's Interpretation
 
 
 66
 CSMFTA argues that this court must interpret the statutory provisions at issue without giving any deference to the interpretation of the Commission because (1) the Commission has long been the industry's adversary in the legislative arena where the single-line rate definition was forged as a compromise position between those who sought termination of collective ratemaking altogether, and those who sought continuation of collective ratemaking, and (2) the precise meaning of the definition is so clear on its face that the congressional intent is unmistakable. It contends:
 
 
 67
 The plain meaning of these words limit the single-line definition to one that is "proposed" to apply "only" over the line of a "single" carrier. Stated negatively, a proposed rate is not a single-line rate if it is to apply via more than one route, i.e. over more than one "line", irregardless [sic ] of whether it is to apply to the single-line service or to the joint-line service provided by the carriers [sic ] party to the tariff.
 
 
 68
 We cannot accept this argument for several reasons. First, CSMFTA, by "stating negatively" the second clause of the statutory definition, actually is arguing that Congress, by stating its proposition in the singular, necessarily excluded the plural. That argument violates a basic principle of statutory interpretation--that the singular includes the plural and the plural includes the singular. 1 U.S.C. Sec. 1.
 
 
 69
 Second, we must also reject CSMFTA's argument because it would require us to find, by negative implication, that Congress meant to exclude a rate "over" several lines. However, where two or more carriers can provide the same service between two points, CSMFTA's interpretation would permit them to fix prices rather than compete.
 
 
 70
 We construe "over," as does the Commission, in accordance with the first meaning given to it in Webster's Third New International Dictionary 1605 (1981): "[F]rom one point to another across an intervening space or barrier." Congress was speaking of "rubber to the road" transportation from one point to another on a carrier's line. Both eastern Kentucky pick-up and delivery charges and the residential delivery charges apply to, and can only be charged for, transportation only over a single carrier's line.
 
 
 71
 Third, to have a "plain meaning," words used by Congress ought to have a plain intent and purpose. CSMFTA asserts that the purpose of Congress in enacting this legislation was (1) to make it impossible for a carrier to use rate bureau disapproval of a single-line rate as an excuse to a shipper for not lowering its rates, and (2) to establish that the only way that a carrier could put into effect a rate applicable only over its own line would be to take independent action.
 
 
 72
 However, CSMFTA fails to provide any reason why a carrier interested in maximizing its profits would choose to take independent action to compete with its competitors and run the risk of being subject to the antitrust laws when it could, simply by taking collective action, collude with its competitors to raise prices and enjoy immunity from antitrust prosecution.
 
 
 73
 Thus, CSMFTA's interpretation, if adopted, would mean that the Act does nothing in the way of deregulating single-line rates. We agree with the court's statement in Niagara I: "As we read petitioner's definition, it would make the prohibition on single-line rates wholly redundant of the provisions of the Act that already allow for 'independent action' by a single carrier." 780 F.2d at 110.
 
 
 74
 (B) Local Rates
 
 
 75
 CSMFTA also alleges that the Commission's interpretation of the term "single-line rate" results in a prohibition exactly like what would have occurred if Congress had simply used the term "local rate," which was in common use throughout the industry. It argues that the industry rates are known as "single-line rates, local rates, and joint rates." Only the terms "single rate" and "joint rate" appear in the provisions of the Act that prohibit certain discussions of single-line rates. Congress did not use the term "local rate" in 49 U.S.C. Sec. 10706(b).
 
 
 76
 CSMFTA argues that single-line rates and local rates differ in that numerous carriers can provide what is properly called single-line (or single-carrier) service between two points as long as each provides a service entirely over its own line; but, if the rate for such single-line service between two points applies to more than one carrier, the rate is not a single-line rate, but a local rate. It contends that "single-line" modifies "rate" rather than "service." The only authorities cited for this proposition are the front title pages of four separate illustrative tariffs. Those title pages recite that the tariffs apply to local, joint and proportional class rates and exceptional classes via all motor routes.
 
 
 77
 In response, the government contends that in common industry usage the term "local rate" means the same thing as "single-line rate," citing Practices of Motor Common Carriers of Household Goods, 118 M.C.C. 762, 763 n. 1 (1973) and Davis & Sherwood, Rate Bureaus and Antitrust Conflicts in Transportation, XII, XIV (Praeger Pub. 1975).
 
 
 78
 CSMFTA's argument ignores the expressed legislative intent to require motor common carriers to compete aggressively to provide transportation services for shippers, where those carriers can individually, without the assistance of any other carrier, provide all of the required transportation and related services between two points. The failure of Congress to distinguish between "single-line" and "local" rates indicates that it intended no such distinction.
 
 
 79
 Further, the meaning of technical industry terms is a function of the Commission, and CSMFTA has not persuaded us that the Commission's interpretation is not reasonable.
 
 
 80
 (C) Application of Statutory Exceptions
 
 
 81
 49 U.S.C. Sec. 10706(b)(3)(D) bans collective discussion of or voting upon single-line rates, but includes four exceptions to that ban. CSMFTA claims that, even if the Commission's interpretation of single-line rates is correct, its proposed tariffs fall within three of those exceptions--the subparagraph (i) exception for general rate increases or decreases; the subparagraph (iii) exception for changes in tariff structures; and the subparagraph (iv) exception for changes in rules and regulations.
 
 
 82
 Both the exception for general increases and decreases and the exception for changes in tariff structures are further specifically limited by requirements that any discussion of single-line rates must be limited to industry average carrier costs and must not include discussion of individual markets or particular single-line rates. CSMFTA has not preserved any issue for consideration with respect to whether its members limited their discussions to industry average carrier costs and did not discuss individual markets or particular single-line rates. Our rulings in these cases make it unnecessary for us to decide whether CSMFTA complied with those requirements. However, we note that the record includes a statement by Dennis M. Miller, its Manager of Rates and Tariffs and Vice President, that members' discussions in the eastern Kentucky proceedings were limited as required by the Act. Cf. Sec. 10706(b)(3)(G) (party alleging carrier's discussion or vote on rates violated Act has burden of showing it occurred). He makes no such claim for the residential charges proceedings; instead, he states that CSMFTA was of the opinion that the proposal was a change in general rules and regulations and hence not subject to the Act's limitations on discussions.
 
 
 83
 The exception for changes in rules and regulations is limited to changes which are of substantially general application throughout the area in which the changes will apply. As we interpret the exception, no limitation upon discussion is necessary because (like discussions in connection with changes in commodity classifications, publishing of tariffs, filing of independent actions, and providing of support services) permissible discussions cannot possibly defeat the purpose of the Act to require competition in the fixing of single-line rates.
 
 
 84
 We see no reason to disagree with the court's conclusion in Niagara II that the Commission's interpretations of these exceptions are reasonable. Accordingly, we conclude that none of the exceptions applies to the single-line rate changes proposed by the petitioner's tariffs.
 
 
 85
 (1) General Rate Increases Exception
 
 
 86
 The Commission, in 49 C.F.R. Sec. 1331.5(j)(1) (1986), has defined a general increase as "a proposed general adjustment of substantially all the rates published in a rate bureau's tariff or tariffs." As noted by the court in Niagara II, 826 F.2d at 1191, the Commission definition is consistent with the legislative history of the Act. "It is particularly important to note that the Committee does not intend that general rate increases or decreases that are applicable to all rates charged by one or more carriers be eliminated from the existing antitrust immunity." House Report, supra, at 28, 1980 U.S.Code Cong. & Admin.News p. 2310 (emphasis added).
 
 
 87
 The Commission held that the eastern Kentucky delivery charges were not general increases because they would have increased only one segment of the transportation charges and would have applied only to a small portion of the rate bureau's territory. It also determined that the residential delivery charges were not general increases because they sought to impose new charges where none had previously existed. Further, as argued by the government, the increases affect only one limited aspect of the line-haul rate (pick-up and delivery) on a narrow class of shipments (those involving residential service).
 
 
 88
 The purpose of a general increase appears to be to spread increased costs over substantially all the customers served by the carriers by increasing virtually all the rates covered by a rate bureau's tariffs. If limited to that purpose, a general increase is not anticompetitive and antitrust immunity is warranted.
 
 
 89
 The Act declares that antitrust immunity is not warranted where the carriers discuss any costs other than industry average carrier costs or discuss individual markets or particular single-line rates, regardless of whether the resulting rate is or is not based on any such prohibited discussion. In the light of this policy, we believe that the Commission's interpretation is reasonable and necessary to accomplish the Congressional purpose.
 
 
 90
 CSMFTA argues that its increases are "general," but does not explain how its interpretation fits into the purposes of the Act and the regulations. It also does not persuade us that it can meet the Commission's definition by simply publishing the charges in separate tariffs.
 
 
 91
 (2) Changes in Tariff Structure Exception
 
 
 92
 The Commission, in 49 C.F.R. Sec. 1331.5(j)(2) (1986), states that a " 'broad change in tariff structure' modifies in a relatively non-uniform fashion the relationship between most rates published in a rate bureau's tariff, and applies to a large area, either nationally or regionally."
 
 
 93
 CSMFTA correctly points out that Sec. 1331.5 establishes, according to its title, additional standards and procedures required for passenger bus industry, rather than motor carrier industry, rate bureaus to retain antitrust immunity. CSMFTA further notes that, although Sec. 10706(b)(3)(E)(i) states that such changes must be "broad," the word "broad" does not appear before "tariff structures" in the exception set forth in Sec. 10706(b)(3)(D)(iii). It also points out that Congress used the term "broad rate restructuring" in limiting collective changes in rates established by independent action. 49 U.S.C. Sec. 10706(b)(3)(B)(ii). No serious objection appears to have been raised to this point when the Commission's rules were initially adopted. See Motor Carrier Rate Bureaus--Implementation of Pub.L. No. 96-296, 364 I.C.C. 464, 493-94 (1980), aff'd in pertinent part sub nom. American Trucking Ass'n v. United States, 688 F.2d 1337 (11th Cir.1982), rev'd on other grounds, 467 U.S. 354, 104 S.Ct. 2458, 81 L.Ed.2d 282 (1984). See also, Collectively Set Accessorial Rates and Charges on Household Goods, HGCB, 1 I.C.C.2d 157 (1985).
 
 
 94
 However, in interpreting the statutory exception, the Commission is required to determine when a proposal is really a tariff restructuring in order to accomplish the Congressional purpose of preventing anticompetitive activity. Some limiting adjective, whether "broad" "substantial" or "significant," must be used to prevent carriers from using the exception to swallow the rule. Further, as noted by the government, the Commission's interpretation only means that the motor carrier industry will be placed on the same footing as other industries. No substantive reason appears in the briefs or in the record for a conclusion that the exception should be narrower or broader than the exception for other industries.
 
 
 95
 Nevertheless, the omission of the word "broad" in this exception, despite its use in comparable language elsewhere in the statute, is not to be minimized. "After all, Congress expresses its purpose by words. It is for us to ascertain--neither to add nor to subtract, neither to delete nor to distort." 62 Cases of Jam v. United States, 340 U.S. 593, 596, 71 S.Ct. 515, 518, 95 L.Ed. 566 (1951). The omission may be critical to the determination of a future case involving an unquestionable change in tariff structure. In this case, we determine that the rate changes cannot appropriately be called a change in tariff structure.
 
 
 96
 The dictionary meaning of "structure," in the context of the Act's use of "tariff structure," is "the interrelation of parts as dominated by the general character of the whole." Webster's Third New International Dictionary 2267 (1981). In this instance, the general character of the whole is economic in nature, and requires expert interpretation and application by the Commission to a historic and highly technical and regulated industry.
 
 
 97
 The changes made in the eastern Kentucky delivery charges and in the residential pick-up and delivery charges are mere aggregations of many specific individual and specific rate adjustments. They are not a change in the interrelation of the parts of a tariff structure.
 
 
 98
 (3) Changes in Rules and Regulations Exception
 
 
 99
 Finally, the Commission held that neither the tariffs established in the eastern Kentucky proceedings nor the tariffs established in the residential charges proceedings qualified under the changes in rules and regulations exception of subparagraph (iv).[4]
 
 
 100
 The ten percent added charge to destinations in eastern Kentucky and the new charge published for pick-up or delivery at residences throughout CSMFTA's territory were published in its rules tariff, ICC CSA 127-K. It is possible to argue, as does CSMFTA, that the change in the charges necessarily results in a change in that rule. However, the Commission held in the eastern Kentucky proceedings that "[t]he proposal involves additional charges for a specific service involving specified shipments to points in a limited geographical area, and these charges cannot properly be labeled 'rules.' " Collectively Set Delivery Charges at Eastern Kentucky, C & SMFTA, I & S No. M-30374, slip op. at 7 (March 19, 1986). Further, it ruled that the changes in the charges were not of substantially general application throughout the area in which the changes would apply because they constituted only a small segment of the territory governed by CSMFTA.
 
 
 101
 The Commission held in the residential pick-up and delivery proceedings that "the fact that rates and charges are contained in a rules tariff does not extend the permissible collective consideration to specific rates and charges." Pickup and Delivery at Private Residences, C & SMFTA, October 1985, I & S No. M-30376, slip op. at 7 (May 7, 1986). Since the charges were obviously of general application throughout CSMFTA's territory, the Commission did not hold that this was an additional ground for rejecting the proposal.
 
 
 102
 The Commission's decisions are consistent with an earlier case from the D.C. Circuit in which motor carriers argued that items of rates and charges, which the Commission had struck from an agreement between the carriers providing for collective action with respect to freight classifications, were "rules and regulations governing classification matters." National Classification Comm. v. United States, 746 F.2d 886, 891 (D.C.Cir.1984). In affirming the Commission decision, Judge Bork stated: "The relevance of the charges to classification characteristics does not turn the charges themselves into such characteristics." Id.
 
 
 103
 CSMFTA argues that the only kind of rules that can be embraced by the word "rule" as used in the exception are rules that do in fact contain rates, charges, or allowances, and that the exception only has meaning if it is interpreted to include rules that contain charges such as those that are at issue in each of the cases under review.[5] In its brief as amicus curiae, Bulk Carrier Freight Conference, Inc. (Bulk Carrier) argues that:
 
 
 104
 There was no reason for Congress to except from the prohibition against discussion and voting upon single-line rates the discussion and voting upon rules and regulations if Congress had not intended such discussion and voting activities to also include the charges, even if single-line in nature, associated with such rules and regulations.
 
 
 105
 Both CSMFTA and Bulk Carrier argue that tariff rules have always contained rates and rates have been published in rules tariffs or the rules section of tariffs.[6]
 
 
 106
 The rules and regulations exception does not require a change in a rule or regulation to be of general application throughout a rate bureau's entire territory. The exception includes any such change so long as the rule applies generally to the area to which the change will apply. However, the primary question to be decided is not whether a rule change is of general application in an area, but whether a change in a charge is automatically a change in a rule. We find nothing in the record or in the briefs of CSMFTA or Bulk Carrier that specifically describes any changes in the rule in question, other than changes in single-line rates. We experience difficulty with arguments that appear to be saying that Congress intended that such single-line rate changes can simultaneously be general increases, changes in tariff structures, and changes in rules or regulations.
 
 
 107
 The carriers' argument, by a literalistic construction of the fourth phrase, appears to create a syllogism as follows: A rule contains charges. The addition of a charge to, a subtraction of a charge from, or the change of a charge within, the rule is a change in the rule. Therefore, Congress intended that all member carriers of a rate bureau, including member carriers with no authority to participate in the transportation to which the change applies,[7] can vote upon a proposal to change a single-line rate if the rule containing the change in the charge is of at least substantially general application throughout the area in which the changes in the charges will apply.
 
 
 108
 The major difficulty with that argument is that it appears to make the exception to the prohibition swallow the prohibition. Granted, the collective establishment of rules and regulations has been a traditional rate bureau activity, and changes in provisions relating to transportation and transportation services may affect charges associated with those provisions; it does not follow that Congress necessarily intended to permit, without limitation, everything that the preceding in pari materia language has either prohibited, or permitted only within specified limitations, whenever a rate bureau changes a single-line rate in a rule or finds a rule it can change by the addition of a single-line rate.
 
 
 109
 We see no reason why Congress would have intended the four items in the subparagraph (iv) exception to be used to permit a majority of carriers, including carriers who could not otherwise vote on the applicable rate changes, to establish single-line rates that would be binding on all carriers except those carriers who individually choose to flag out of the proposed change rather than remain in a price-fixing combination that is immune from antitrust regulation.
 
 
 110
 The purpose of the proposal for the ten percent delivery charge was intended to compensate carriers for serving a sparsely populated consuming area. The purpose of the increase in residential charges was intended to reimburse carriers for the special handling expenses incurred in serving residential customers. These might have been published separately as changes in charges, and not as a part of the rule, without in any way affecting any rule or regulation then in existence.
 
 
 111
 The Commission has ruled that this type of collective action defeats the congressional policy that individual carriers must determine their own rates in a competitive atmosphere. As our previous discussion indicates, we also have determined that the Act is premised upon that policy. Although CSMFTA does not agree that Congress established such a policy, its only countervailing arguments are based primarily upon what it considers to be the plain meaning of the statutory language.
 
 
 112
 The Commission's interpretation does not violate the plain meaning of the language. It only rejects the notion that any change in a charge necessarily is a change in the rule. The Commission has clearly acknowledged that rate tariffs may contain rules and rules may contain rate tariffs. The plain meaning of "change in a single-line rate" is not the same as the plain meaning of "change in a rule or regulation," and no mere change in form only can alter that plain meaning.
 
 
 113
 The Commission's interpretation in these cases applies only where the change is merely a specific change in a single-line rate. Its decisions state that its practice is to consider collective-action violations on a case-by-case basis. The Commission's decisions in these two cases do not preclude an appropriate determination consistent with congressional intent in any other case when a problem that appears to require a change in a rule or regulation also appears to be inseparable from, or highly relevant to, a claimed necessity for making corresponding changes in the associated rates or charges.
 
 
 114
 Even if we did not give deference to the Commission as required by Congress, familiar principles of statutory construction require us to construe in a comparable manner all of the four items excepted by subparagraph (iv) from the prohibition against single-line rate discussions and voting and from the prohibition against member carriers voting upon rates not applicable to any transportation or services that they provide. See, e.g. Third Nat'l Bank v. Impac Ltd., 432 U.S. 312, 322, 97 S.Ct. 2307, 2313, 53 L.Ed.2d 368 (1977).
 
 
 115
 Obviously, any discussion or voting upon each of those four items may, in some instances, require discussion or voting upon single-line rates. Otherwise, there would be no purpose in including all four items as exceptions to the two general prohibitions. In the case of publishing tariffs or filing independent actions, single-line rates generally will be included therein.
 
 
 116
 Subparagraphs (i) and (ii) both permit limited discussions of and voting upon single-line rates. However, neither subparagraph (iii) nor (iv) places any limitation upon such discussions or voting. The most reasonable interpretation of these exceptions, construed in pari materia with the other provisions of the Act, is that Congress believed that any discussion of or voting upon single-line rates by member carriers (even if member carriers who will not participate in the transportation are permitted to vote) in connection with subparagraphs (iii) and (iv) could not have any serious anti-competitive effect upon the single-line rates to be charged by members of a rate bureau, nor otherwise defeat the purposes of the Act. Antitrust immunity is warranted because of the need for expediting such actions and in order to preclude the possibility of purely technical violations of the antitrust laws.
 
 IV. CONCLUSION
 
 117
 Based upon the foregoing, we conclude that the Commission's decision, both with respect to the single-line prohibition and the statutory exceptions, was based upon a reasonable construction of the Act. Accordingly, the petitions for review are denied and the decision of the Commission is affirmed.
 
 
 118
 CORNELIA G. KENNEDY, Circuit Judge, concurring in part, dissenting in part.
 
 
 119
 I concur in the panel's opinion except that portion which deals with the Interstate Commerce Commission's [Commission] interpretation of the Rules and Regulations exception in 49 U.S.C. Sec. 10706(b)(3)(D)(iv). That exception provides that the single-line rate prohibition does not prevent carriers from discussing or voting upon "changes in rules or regulations which are of at least substantially general application throughout the area in which such changes will apply." The proposed residential tariff, in my opinion, can only be found to be of general application throughout the area in which it is to apply. Indeed it is to apply to all residential pick up and delivery in Central & Southern Motor Freight Tariff Association's ("CSMFTA") entire territory.
 
 
 120
 The Commission concluded that any rule which contains a charge is not a rule within the meaning of the exception. I agree with CSMFTA that this interpretation renders the exception meaningless. It is an exception to the prohibition against the collective "discussion of or voting on single-line rates." A "single-line rate" is defined as "a rate, charge, or allowance." Where the statute prohibits discussion of rates, charges, or allowances, the exceptions to that prohibition must also be concerned with rates, charges, or allowances.
 
 
 121
 One of the difficulties in analysing the Rules and Regulations exception is that we are dealing with multiple layers of exception. 49 U.S.C. Sec. 10706(b)(2) provides antitrust immunity for agreements among carriers, particularly agreements regarding rates. Rates are set forth in rate rules. The statute here excepts single-line rate discussions from the immunity and finally provides for three exceptions from the exception regarding single-line rate discussion.
 
 
 122
 I am compelled to agree with amicus Bulk Carrier Conference, Inc. that
 
 
 123
 [t]here was no reason for Congress to except from the prohibition against discussion and voting upon single-line rates the discussion and voting upon rules and regulations if Congress had not intended such discussion and voting activities to also include the charges, even if single-line in nature, associated with rules and regulations.
 
 
 124
 Accordingly, I dissent from the panel's opinion insofar as it affirms the Commission with respect to the proposed residential tariff. In all other respects, I concur.
 
 
 
 [1]
 49 U.S.C. Sec. 10706(b)(1) provides: "In this subsection, 'single-line rate' refers to a rate, charge, or allowance proposed by a single motor common carrier that is applicable only over its line and for which the transportation can be provided by that carrier."
 
 
 [2]
 All rate bureau actions are subject to the prohibition of 49 U.S.C. Sec. 10706(b)(3)(B)(ii), which provides, in pertinent part:
 [T]he organization may not interfere with each carrier's right of independent action and may not change or cancel any rate established by independent action after the date of enactment of this subsection, other than a general increase or broad rate restructuring, except that changes in such rates may be effected, with the consent of the carrier or carriers that initiated the independent action, for the purpose of tariff simplification, removal of discrimination, or elimination of obsolete items.
 
 
 [3]
 49 U.S.C. Sec. 10706(b)(3)(D) provides, in pertinent part:
 (3) Agreement[s] submitted to the Commission under this subsection may be approved by the Commission only if each of the following conditions are [sic ] met:
 ....
 (D) No agreement approved under this subsection may provide for discussion of or voting upon single-line rates on or after January 1, 1984, except that such date shall be July 1, 1984, if the Motor Carrier Rate making Study Commission does not submit its final report under section 14(b)(4) of the Motor Carrier Act of 1980 on or before January 1, 1983.... This subparagraph and subparagraph (B)(i)(II) of this paragraph shall not apply to the following:
 (i) general rate increases or decreases if the agreement gives shippers, under specified procedures, at least 15 days' notice of the proposal and an opportunity to present comments on it before a tariff containing the increases or decreases is filed with the Commission and if discussion of such increases or decreases is limited to industry average carrier costs and, after the date of elimination of the antitrust immunity by this subparagraph, does not include discussion of individual markets or particular single-line rates;
 (ii) changes in commodity classifications;
 (iii) changes in tariff structures if discussion of such changes is limited to industry average carrier costs and, after the date of elimination of antitrust immunity by this subparagraph, does not include discussion of individual markets or particular single-line rates;
 (iv) publishing of tariffs, filing of independent actions for individual members['] carriers, providing of support services for members, and changes in rules or regulations which are of at least substantially general application throughout the area in which such changes will apply. (Emphasis added.)
 
 
 [4]
 The subparagraph (b)(3)(D)(iv) exception for rules and regulations applies to: "changes in rules or regulations which are of at least substantially general application throughout the area in which the changes will apply."
 
 
 [5]
 We note, parenthetically, that CSMFTA has provided no reason, and we question whether there is a reason, why Congress would have included the subparagraph (iv) exceptions in the Act if it had intended to adopt CSMFTA's interpretation of the statutory definition of single-line rate
 
 
 [6]
 In response to similar arguments, the Second Circuit in Niagara II, 826 F.2d at 1192, stated:
 Petitioner's claim that the proposed tariff falls within the exemption for "changes in rules or regulations," 49 U.S.C. Sec. 10706(b)(3)(D)(iv), merits little discussion. The exemption speaks of changes in a rate bureau's rules, not changes in rates. Petitioner's terminal service tariff proposed specific rate increases rather than "changes in rules or regulations which are of at least substantially general application." Id. Resort to legislative history is unnecessary; a plain reading of the statutory exemption leaves no doubt as to its inapplicability to petitioner's rate proposal. The Commission's interpretation, therefore, hardly can be termed anything other than reasonable.
 
 
 [7]
 The exceptions described in subparagraph (b)(3)(D) are exceptions not only from the prohibition against discussion and voting upon single-line rates, but also are exceptions from the requirement of subparagraph (b)(3)(B)(i)(II), which provides that "after January 1, 1981, only those carriers with authority to participate in the transportation to which the rate proposal applies may vote upon such rate proposal."