851 F.2d 1468
 271 U.S.App.D.C. 241, 1988-2 Trade Cases 68,139
 CLARK & REID COMPANY, INC. and Household Goods Carriers'
Bureau, Inc., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
National Small Shipments Traffic Conference, Inc., et al.,
Eastern Central Motor Carriers Association, Inc.,
et al., Intervenors.
 No. 86-1601.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 15, 1988.
Decided July 19, 1988.
 
 Thomas M. Auchincloss, Jr., with whom Leo C. Franey, Washington, D.C., was on the brief, for petitioners.
 Lawrence H. Schecker, I.C.C., with whom Robert S. Burk, General Counsel, John J. McCarthy, Jr., Deputy Associates General Counsel, I.C.C., Robert B. Nicholson and John P. Fonte, Dept. of Justice, Washington, D.C., were on the brief, for respondents.
 Elliott Bunce, with whom John W. McFadden, Jr., Arlington, Va., and Kevin M. Williams were on the brief, for intervenors The Eastern Cent. Motor Carriers Ass'n, Inc., et al.
 Daniel J. Sweeney, Washington, D.C., for intervenors National Small Shipments Traffic Conference, Inc., et al.
 Before ROBINSON, WILLIAMS and SENTELLE, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 Movers of household goods charge extra for "accessorial services": packing and unpacking, storage in transit, warehouse handling, extra labor, piano moving, waiting time, overtime loading and unloading, with special premiums where they must use elevators or stairs or carry goods an extra distance. Petitioner Household Goods Carriers' Bureau, Inc., agent for about 1,700 motor common carriers of household goods (including Clark & Reid), filed a collectively agreed-on tariff stating rates for certain of these services. If effective, the proposed rates would cover about 150,000 household goods shipments. Joint Appendix (J.A.) 191a, 210a. The Interstate Commerce Commission rejected the tariff on the grounds that it violated the statutory ban on collective "single-line" ratemaking by motor carriers. 49 U.S.C. Sec. 10706(b)(3)(D) (1982). See Collectively Set Accessorial Rates and Charges on Household Goods, HGCB, 1 I.C.C.2d 957 (1985). Petitioners filed for review in the First Circuit, which held that venue did not lie there and transferred the case here. Clark & Reid Co. v. United States, 804 F.2d 3 (1st Cir.1986).
 
 
 2
 We uphold the Commission's conclusion that the tariff indeed represents single-line ratemaking, as well as its rejection of petitioners' claims of specific exemptions.
 
 I. SINGLE-LINE RATEMAKING
 
 3
 In 1948 Congress enacted the Reed-Bulwinkle Act, codified (as amended) at 49 U.S.C. Sec. 10706, exempting from the antitrust laws collective rate agreements by motor carriers that received ICC approval. In the Motor Carrier Act of 1980, Pub.L. No. 96-296, 94 Stat. 793, Congress cut back the exemption. One restriction was a prohibition on the collective discussion or voting of "single-line rates," 49 U.S.C. Sec. 10706(b)(3)(D), which the Act defined as:
 
 
 4
 a rate, charge, or allowance proposed by a single motor common carrier that is applicable only over its line and for which the transportation can be provided by that carrier.
 
 
 5
 Id. Sec. 10706(b)(1).
 
 
 6
 The Bureau argues that rates for accessorial services do not fall within this provision because they cannot always be provided by the carrier that contracts with the shipper, and often are not. Thus we are told that Clark & Reid is Boston-based and maintains no facilities in Alaska for providing accessorial services. It follows, we are told, that rates for accessorial services provided by Alaska-based movers are therefore not single-line rates; such movers should be free to cartelize them. Such a construction of the Motor Carrier Act would, so far as we can see, restore Reed-Bulwinkle to its former glory. After all, by the same logic Boston-Nome transportation is not single-line, for (except for carriers that can provide accessorial services in both Boston and Nome), each Boston-Nome shipment requires two firms. An agreement between Clark & Reid and a Nome firm on Boston-Nome rates (covering accessorial services as well as transportation) would be a different matter, but is of course not before us.
 
 
 7
 Embarrassingly, petitioners attempt to revive an argument rejected by this court in Niagara Frontier Tariff Bureau, Inc. v. United States, 780 F.2d 109 (D.C.Cir.1986) ("Niagara I "). As a single-line rate must by statute be one "proposed by a single motor common carrier that is applicable only over its line," petitioners argue that as the agreed-on rates proposed here would be applicable over the lines of all the Bureau's carriers, they do not fall within this definition. This analysis is staggering. It construes the Motor Carrier Act, concededly designed to reduce cartelization, to authorize cartels for every transaction except those subject to monopoly.
 
 
 8
 Petitioners suggest that one congressional goal was to allow individual carriers to break the cartel, and claim their proposed reading of "single-line rate" would assure individual carriers that right. But that purpose is fully achieved by the Act's separate provision allowing "independent action" by a single carrier. See id. at 110 (citing 49 U.S.C. Sec. 10706(b)(3)(B)(ii)).
 
 
 9
 The Bureau argues that we are not bound by Niagara I because of subsequent refinements by the Supreme Court in the degree of deference we owe administrative agencies in statutory construction. See INS v. Cardoza-Fonseca, 480 U.S. 421, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Levels of deference have nothing to do with this case; only a flat rule that administrative agencies are always wrong could drive a court to overturn the ICC's rejection of petitioners' theory.
 
 
 10
 In Niagara I we concluded that petitioners' construction "borders on the frivolous." 780 F.2d at 110. The carriers' pressing the theory in this court a second time takes it well past the border of frivolity, deep into the heartland. See also Central & Southern Motor Freight Tariff Ass'n v. United States, 843 F.2d 886, 891-96 (6th Cir.1988); Niagara Frontier Tariff Bureau, Inc. v. United States, 826 F.2d 1186 (2d Cir.1987) ("Niagara II ") (applying collateral estoppel against renewed assertion of this theory by the same rate bureau that advanced it in Niagara I ).
 
 
 11
 II. EXEMPTIONS FOR CHANGES IN TARIFF STRUCTURE AND FOR RULES
 
 OF GENERAL APPLICABILITY
 
 12
 Even if a rate is for a single line, it may fall under some exemption. Petitioners invoke two:
 
 
 13
 (iii) [c]hanges in tariff structures if discussion of such changes is limited to industry average carrier costs and, after the date of elimination of antitrust immunity by this subparagraph, does not include discussion of ... single-line rates; [and]
 
 
 14
 (iv) ... changes in rules or regulations which are of at least substantially general application throughout the area in which such changes will apply.
 
 
 15
 49 U.S.C. Sec. 10706(b)(3)(D).
 
 
 16
 Viewing all rates in the aggregate as constituting a "structure," any change in any rate would superficially qualify as a "change[ ] in tariff structure." Accordingly, as the Sixth Circuit observed in Central & Southern Motor Freight Tariff Ass'n v. United States, 843 F.2d at 897, some limiting concept must be used to prevent the exception from swallowing the rule. The ICC's solution has been to limit the exception to "broad" restructurings. The changes here apply only to specific accessorial services. Item 105, for example, would change the packing rate in Mahoning and Trumbull Counties, Ohio. The Commission notes, moreover, that even in the aggregate the changes affect rates in no more than 13% of the counties in the contiguous 48 states. 1 I.C.C.2d at 963. But in any event we doubt that individual changes, no matter how many a Bureau sought to make at one time, could ever be viewed as structural.
 
 
 17
 We need not search for the essential meaning of "changes in tariff structure," however, for the exception explicitly precludes "discussion of individual markets or particular single-line rates." Here the Bureau clearly considered such markets and rates; the changes were distinctly market-specific. See Niagara II, 826 F.2d at 1191-92 (upholding Commission's rejection of collective discussion of rates in a particular locality).
 
 
 18
 Petitioners finally invoke the exception for changes in "rules ... which are of at least substantially general application" throughout the area in which such changes will apply. Prior to the Motor Carrier Act's adoption, they say, rates were often contained in rules, and Congress was aware of the practice. Whatever the prior practice, we accept without hesitation the Commission's view that motor carriers cannot avoid the antitrust laws simply by wrapping their specific rate changes in the clothing of rules. See Central & Southern Motor Freight Tariff Ass'n v. United States, 843 F.2d at 899; Niagara II, 826 F.2d at 1192.
 
 
 19
 We deny the petition.